## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| DEMOCRATIC PARTY OF VIRGINIA and DCCC,<br><br>                    Plaintiffs,<br><br>        v.<br><br>ROBERT H. BRINK, in his official capacity as the Chairman of the Board of Elections; JOHN O'BANNON, in his official capacity as Vice Chair of the Board of Elections; JAMILAH D. LECRUISE, in her official capacity as the Secretary of the Board of Elections; and CHRISTOPHER E. PIPER, in his official capacity as the Commissioner of the Department of Elections,<br><br>                    Defendants. | Civil Action No. __3:21cv756__ |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Democratic Party of Virginia ("DPVA") and DCCC file this Complaint for Declaratory and Injunctive Relief against Defendants and allege as follows:

### NATURE OF THE ACTION

1.      This is an action brought under the U.S. Constitution and the Voting Rights Act to vindicate and safeguard the fundamental rights of the Plaintiffs—both Democratic Party committees—and the voters among their membership and with whom they associate. While states have broad power to regulate elections, they cannot exercise that power in a manner that violates the Constitution or federal law. *See, e.g.*, *Foster v. Love*, 522 U.S. 67, 69 (1997); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). In this action, Plaintiffs challenge two aspects of Virginia law that do just that: (a) the requirement that voter registration applicants disclose their full nine-

digit social security number to register to vote, *see* Va. Const. art. II, § 2 (the "Full SSN Requirement"), and (b) the inequitable, inadequate—and for some voters, nonexistent—notice and cure procedures for absentee ballots with technical, but remediable, defects (the "Inequitable Notice and Cure Process").

2.     By requiring Virginians to disclose their full nine-digit social security number to register to vote, *see* Va. Const. art. II, § 2, Virginia imposes an unlawful barrier to voter registration that unjustifiably burdens not only the right to vote, but also Plaintiffs' rights of speech and association, the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), and the Privacy Act, 5 U.S.C. § 552a note. Virginia does not process online applications without a voter's full SSN, and paper applications contain a warning that applications lacking a full SSN will be denied.

3.     In an age where serious concerns about the risks of identity theft are widespread and growing among the American public, Virginia's Full SSN Requirement severely hampers the ability of third-party entities—including Plaintiffs—to run voter registration drives, as well as Plaintiffs' ability to broadly associate with every eligible citizen who would otherwise register to vote and support Plaintiffs' candidates. To register voters themselves, Plaintiffs must persuade applicants to provide their full SSN to a stranger and, if they are successful, make themselves vulnerable to potentially serious legal consequences should there be a data breach or other exposure of the SSNs.

4.     At best, these issues increase the cost and slow the pace of voter registration activities in the Commonwealth. At worst, they make undertaking voter registration activities so burdensome as to inhibit the activity. The negative impact of requiring full SSNs, moreover, is not limited to voters who register with the assistance of non-governmental third parties. Even in convincing eligible Virginians to register directly with the state, Plaintiffs must overcome the

public's understandable hesitancy to provide a full SSN with the knowledge that it will be entered into a voter registration database—the continuing target of foreign cyber attackers. And Plaintiffs must take on additional legal risks attendant in handling voters' full SSNs, limiting the pool of those willing to conduct registration drives.

5. Defendants are aware of the risk that cyber attackers pose to Virginia's voting systems. The Virginia Department of Elections dedicates an entire page of its website to the measures it takes to minimize that risk with respect to election outcomes—stressing that voting machines are not connected to the internet on election day to prevent hacking. The Department of Elections does not appear to similarly publicly address what measures are taken to protect voter registration data, including SSNs, from the same threat.

6. Both the federal government and the Commonwealth of Virginia advise citizens against disclosing their full SSNs to unknown individuals. Indeed, of all the personal information a Virginia voter registration application collects, Virginia law carves out specific dissemination and use prohibitions for just one piece of information: the SSN. *See* Va. Code Ann. §§ 24.2-407.1, 24.2-416.5.

7. In requiring a full SSN to register to vote, Virginia is in the significant minority of states. That virtually no other state requires it is strong evidence that it is wholly unnecessary to prevent voter fraud or maintain accurate voter lists. Simply put, Virginia has no need to gather voters' full SSNs. Yet, in maintaining this requirement, Virginia imposes significant burdens on the right to vote and the rights of free speech and association, and it clashes with the clear dictates of the Civil Rights Act and the Privacy Act.

8. The second subject of this lawsuit is an issue that arises at the other end of the voting process: once voters have successfully registered, completed, and timely returned their

absentee ballots, Virginia's Inequitable Notice and Cure Process threatens to disenfranchise lawful voters due to technical defects with their ballots that could be remedied if voters were provided notice and a meaningful opportunity to "cure" those defects to save their ballots from rejection. Rather than a uniform cure procedure, the Commonwealth unconstitutionally requires that local officials provide notice to some voters with defects on their ballots but not others, mandates that only certain voters receive a meaningful opportunity to cure their ballots, and conditions a voter's opportunity to avoid disenfranchisement on where the voter lives and the whims of their local election officials.

9.      Virginia holds general elections on Tuesdays. *Id.* § 24.2-101. Virginia voters have until 7:00 p.m. on election day to vote and then postmark and mail, return to the general registrar, or deposit their absentee ballot in a drop-off location (the "Absentee Ballot Return Deadlines"). *Id.* §§ 24.2-707, 24.2-709. Absentee voters have also been afforded until noon on the Friday *after* election day to cure a ballot flagged for rejection due to a technical defect (the "Cure Deadline"). *See id.* § 24.2-709.1(C).

10.      But Virginia's notice and cure timeline has two significant gaps. First, only those voters who return their ballots by *the Friday before* election day are guaranteed to receive notice and the opportunity to cure, as well as instructions for how to cure if their ballot is returned and identified as defective. *Id.* § 24.2-709.1(C) (the "Notice Cutoff"). Thus, in general elections, Virginia law establishes that voters whose ballots are received any later than *four days before* the election may receive *no notice* that their ballots have been flagged for rejection for a technical defect and, as a result, will not have a meaningful opportunity to cure them to ensure that they are counted. Second, ballots returned by mail and postmarked by election day are timely if received by noon on *the Friday after* election day (the "Mail Deadline"). *Id.* § 24.2-709. The Mail Deadline

is the same as the Cure Deadline. Thus, some timely absentee voters whose ballots have curable defects have absolutely *no notice* of and *no opportunity to cure* those defects, and their ballots will be rejected as void.

11.     In creating a system where local officials are only *required* to provide notice and an opportunity to cure until the Notice Cutoff, the Commonwealth has mandated an environment of differential treatment of voters who are, for all meaningful purposes, identically situated. There is no meaningful difference—or adequate justification for categorizing as "different"—a voter whose ballot is received four days before the election as opposed to three days before (or two, or one, or on election day for that matter). Yet, while Virginia requires that the four-day-plus voters be notified and advised of how they may cure technical defects with their ballots, if a voter's ballot is delayed just a single day—even for reasons outside their control (such as postal delays)—they are suddenly not entitled to the same treatment and may very well be disenfranchised as a result.

12.     Because whether the sub-four-day voters are given notice and a meaningful opportunity to cure is left to the discretion of the localities in which they vote, that differential treatment further turns on where the voter happens to live in the state. In other words, if two voters cast absentee ballots with identical technical defects that arrive at the exact same time after the Notice Cutoff but before the Mail Deadline, whether the voter is notified about those defects—and provided the opportunity to fix them and have his or her vote counted—is dictated solely by the luck of geography: specifically, the voter's county of residence and the preferences of his or her local election officials.

13.     In other words, Virginia has created an absentee voting regime that abides by the following timetable, with election day designated as day 0:

| Day -4 | Friday before election day | Voters whose absentee ballots are received by today and flagged for rejection due to a technical defect **must receive notice and instructions on how to cure to save ballot from rejection** (the "Notice Cutoff"). Va. Code Ann. § 24.2-709.1(C). Voters whose ballots are received **after** today are *not* **entitled to receive** *any* **notice** that their ballots have been flagged for rejection or that they have the right—for the next seven days—to cure that defect and save their ballot from rejection. *See* Va. Code Ann. § 24.2-709.1(C). |
|---|---|---|
| Day 0 | Election day | Absentee ballots returned in person or to a drop-off location must be returned by 7:00 p.m.; absentee ballots returned by mail must be postmarked by today (the "Absentee Ballot Return Deadlines"). Va. Code Ann. §§ 24.2-707, 24.2-709. |
| Day +3 | Three days post-election | Mailed ballots (with the exception of certain overseas and military ballots, discussed below) must be received by 12:00 p.m. to be counted (the "Mail Deadline"). Va. Code Ann. § 24.2-709(B). |
| Day +3 | Three days post-election | Voters whose ballots have been flagged for rejection have a right to cure by 12:00 p.m. to ensure their ballots are counted in the election (the "Cure Deadline"). Va. Code Ann. § 24.2-709.1(C). |
| Day +7 | Seven days post-election | Electoral boards to meet, make final determinations on validity of all provisional ballots, and ascertain results. Va. Code Ann. §§ 24.2-653.01, 24.2-671. |
| Day +9 | Nine days post-election | Absentee ballots returned by a certain class of military and overseas voters must be received by 5:00 p.m. to be counted. Va. Code Ann. § 24.2-709(C). |
| Day +10 | Ten days post-election | Electoral boards to provide State Board with amended certified abstract, if any. Va. Code Ann. § 24.2-709(C).[1] |
| Day +13 | Thirteen days post-election[2] | State Board meets to ascertain final vote count and certify statewide election results. Va. Code Ann. § 24.2-679(A). |

---

[1] This deadline permits local electoral boards to send an amended certified abstract of their vote total to the State Board if between Day +7 and Day +9 they received additional absentee ballots from "covered voters" as defined in Va. Code Ann. § 24.2-452, which includes certain uniformed-service voters and overseas voters.

[2] This is the time frame for a November general election. The Board must meet within a week after election day for special elections. Va. Code Ann. § 24.2-679(B).

14.     There is no justifiable reason to provide notice and a meaningful opportunity to cure to some voters but not others based on the arbitrary pre-election Friday Notice Cutoff. As presently constructed, Virginia's Inequitable Notice and Cure Process offends the Constitution by depriving affected voters of their procedural due process rights under the Fourteenth Amendment and burdening the right to vote in violation of the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action under 52 U.S.C. § 10101, 42 U.S.C. §§ 1983 and 1988, and 5 U.S.C. § 552a note to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution, the Civil Rights Act, and the Privacy Act. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States. This Court has jurisdiction to grant declaratory and injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

16.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities only.

17.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred or will occur in this judicial district and in this division.

## PARTIES

18.     Plaintiff Democratic Party of Virginia ("DPVA") is a political party as defined by VA. Code Ann. § 24.2-101 and is the officially recognized state party committee for the Democratic Party in the Commonwealth of Virginia. DPVA headquarters are located in Richmond, Virginia. DPVA's mission is to elect Democratic candidates in local, county, state, and federal

elections in the Commonwealth and to help its members and constituents successfully register to vote. In support of its mission, DPVA has historically (and will continue to) encourage and facilitate voter registration among eligible voters throughout the Commonwealth, including by holding voter registration drives. As part of that process, DPVA encourages potential voters to register and vote, provides potential voters with voter registration forms, assists potential voters in completing these forms, collects completed forms from potential voters, and submits completed forms to the general registrar. The Full SSN Requirement threatens and inhibits DPVA's efforts to register eligible voters throughout the Commonwealth, making it harder for DPVA to succeed in its mission of electing Democrats to public office in elections up and down the ticket. Many potential voters are reluctant, unwilling, or unable to provide their full SSN, and for those that do, Plaintiffs' collection of that information potentially exposes them to liability, should there be a breach of that sensitive information. It also makes it more difficult to recruit volunteers willing to do this important work; they, like Plaintiffs, are concerned about exposure to potential liability.

19.     Virginia's Inequitable Notice and Cure Process also directly and concretely harms DPVA. DPVA coordinates—through messaging, communications, funding, turnout, and more—with its members, the campaigns for the Democratic slate of candidates in elections, and other supporting partners (such as DCCC) to elect Democrats to public office. As part of those efforts, DPVA monitors the status of absentee ballot requests, distributions, returns, and processing based on data made available under Virginia's public records laws. DPVA also attempts to identify and contact voters whose absentee ballots have been flagged for rejection due to a technical defect and attempts to educate them and assist them in curing their ballots to ensure that their votes are counted. These efforts—to ensure DPVA's members and constituents receive notice that their ballots require a cure, that they have a meaningful opportunity to cure, and that every vote timely

cast is counted—are hindered by the Inequitable Notice and Cure Process.

20.     It is inevitable that some voters supporting Democrats will return absentee ballots after the Notice Cutoff but before the Absentee Ballot Return Deadlines and—because of the Inequitable Notice and Cure Process—will not receive notice that their ballot has been identified for rejection due to a curable defect or have an opportunity to cure that defect. In recent years, multiple elections in the Commonwealth have been decided by vanishingly small margins. In 2017, the control of the Virginia House of Delegates came down to a tied race that was ultimately decided by drawing a name from a bowl (to the favor of the Republican candidate). Thus, even if the number of voters who are not notified that their ballots have curable technical defects is small, the failure to offer those voters the same process provided to those whose ballots are received by the Notice Cutoff directly threatens DPVA's and its candidates' electoral prospects, and, indeed, DPVA's very mission. For the same reasons, the Inequitable Notice and Cure Process directly harms DPVA's members and the voters with whom it associates (and who associate with it).

21.     Moreover, both the Full SSN Requirement and the Inequitable Notice and Cure Process further injure DPVA by requiring that it divert resources to attempt to lessen the impacts of these laws on its members, constituents, supporters, and competitive prospects. Specifically, due to the Full SSN Requirement DPVA must dedicate additional resources towards voter registration to ultimately register fewer voters, knowing that some voters who it could otherwise register will refuse once confronted with providing their full SSN to a stranger. The Inequitable Notice and Cure Process also diverts scarce resources and staff time, forcing DPVA staff and volunteers to act as the party providing notice and explaining the opportunity to cure to voters whose local officials choose not to do so after the Notice Cutoff passes. Were it not for these unconstitutional laws, these resources could go to other mission-critical efforts.

22.     Plaintiff DCCC is the national congressional campaign committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14). DCCC's mission is electing Democratic candidates to the U.S. House of Representatives from congressional districts across the United States, including from Virginia's 11 congressional districts. DCCC works to accomplish its mission across the country and in Virginia by, among other things, making expenditures for, and contributions to, Democratic candidates for U.S. Congress and assisting state parties throughout the country, including in Virginia. In years in which Virginia has congressional elections, DCCC coordinates—through messaging, communications, funding, turnout, and more—with its members, Democratic candidates for U.S. House, and other supporting partners (such as DPVA) to get Democratic House candidates elected to public office. DCCC coordinates with and relies on DPVA and other similar organizations to conduct voter registration drives in Virginia.

23.     The Full SSN Requirement and Inequitable Notice and Cure Process harm DCCC in the same way that it harms the DPVA, as discussed above. Additionally, in 2022, DCCC plans to execute a targeted, in-person voter registration program in Virginia, relying on DCCC staff and volunteers. DCCC has already opened a headquarters in Virginia this year and has plans to open at least one other one. Both of these headquarters are in congressional districts where it plans to conduct in-person voter registration efforts. The Full SSN Requirement requires DCCC to dedicate additional time and resources to ensuring that its voter registration efforts do not jeopardize the sensitive information of voters. As a direct result of the Full SSN Requirement, DCCC has to dedicate additional time and resources to instruct volunteers on how to properly handle and store voter registration applications with full SSNs. In 2022, DCCC also plans to monitor the status of absentee ballot requests, distributions, returns, and processing based on data made available under Virginia's public records laws. DCCC will attempt to identify and contact voters whose absentee

ballots have been flagged for rejection due to a technical defect, educate them about their rights to "cure" their ballots, and assist them in curing their ballots to ensure that their votes are counted and that they are not disenfranchised by Virginia's Inequitable Notice and Cure Requirement.

24.     Defendants Robert H. Brink, John O'Bannon, and Jamilah D. LeCruise (collectively, the "Board Defendants") are named in their official capacities as Chairman, Vice Chair, and Secretary of the Virginia State Board of Elections (the "Board"), respectively. The Board Defendants are responsible for "supervis[ing] and coordinat[ing] the work of the county and city electoral boards and of the registrars to obtain uniformity in their practices and proceedings and legality and purity in all elections." Va. Code Ann. § 24.2-103(A). The Board convenes in Richmond, Virginia.

25.     Defendant Christopher E. Piper is named in his official capacity as the Commissioner of the Department of Elections. The Commissioner is appointed by the Governor and employs and oversees "the personnel required to carry out the duties required by law and imposed by the [State] Board [of Elections]." *Id.* § 24.2-102(B). The Office of the Commissioner is located in Richmond, Virginia.

## STATEMENT OF FACTS

26.     At issue in this action are two aspects of Virginia law that, in the first instance, make it harder to register eligible voters in the Commonwealth, and then—once voters have successfully registered, voted, and returned their ballots—threaten to disenfranchise them for technical defects on their absentee ballot envelopes without notice or a meaningful opportunity to cure those defects. Each challenged law is discussed, in turn, below.

## I.   Virginia's Full SSN Requirement

27.     The overwhelming majority of states do not require voters to provide their full nine-digit SSN to register to vote. Virginia is one of only three states that maintains this requirement.[3]

28.     All Virginia voters are required to submit their full SSN number to register to vote. *See* Va. Const. art. II, § 2. This requirement applies to every method of voter registration, including both electronic and paper applications. *See* Va. Code Ann. §§ 24.2-416.7(C)(3), 24.2-418(A).

29.     If a potential Virginia voter submits a voter registration application that does not include their full nine-digit SSN, that application will be rejected, and the person will not be registered to vote. *See* Va. Admin. Code § 20-40-40(A)**.**

30.     It is not surprising that most states do not require a full SSN to register to vote: it is clearly not necessary to maintain voter registration rolls or protect against voter fraud.

31.     In addition, the Privacy Act of 1974 (the "Privacy Act"), Pub. L. No. 93–579, 88 Stat. 1896, 1909, (contained as amended in 5 U.S.C. § 552a note), forbids it.

32.     Specifically, the Privacy Act prohibits any federal, state, or local government agent from "deny[ing] to any individual any right, benefit, or privilege provided by law because of such

---

[3] The U.S. Election Assistance Commission identifies five states—South Carolina, Tennessee, Virginia, New Mexico, and Kentucky—as "requir[ing]" a full SSN for voter registration, but this number is over-inclusive. U.S. Election Assistance Commission, Register To Vote In Your State By Using This Postcard Form and Guide ("National Voter Form Instructions"), https://www.eac.gov/assets/1/6/Federal_Voter_Registration_ENG.pdf. South Carolina agreed to discontinue its use of the full SSN for voter registration purposes last year, after it was sued by DCCC and others over the requirement. *See* Seanna Adox, *SC voters can register without giving full Social Security number, following lawsuit*, The Post & Courier (Jan. 17, 2020), *available at* https://www.postandcourier.com/politics/sc-voters-can-register-without-giving-full-social-security-number-following-lawsuit/article_28faa696-3939-11ea-8071-732dc2e17cee.html.   New Mexico requires a full SSN only for online registrations; it is not required for paper applications. N.M. Stat. Ann. § 1-4-5.4. And although Kentucky *requests* the full SSN, it *does not reject* voter applications on that basis. Ky. Rev. Stat. Ann. § 116.155 ("The registration form shall include the voter's . . . Social Security number" but "[n]o person shall be denied the right to register because of the failure to include his Social Security number.").

individual's refusal to disclose his social security account number." *Id.* There is a limited "grandfather" provision in the Act, which permits a state to claim an exception from the Act's requirements if it: (1) maintained a system of records before January 1, 1975, and (2) required the disclosure of an individual's full SSN to verify an individual's identity under that system of records. *Id.*

33.    Through its use of the Full SSN Requirement, Virginia has operated as if it qualifies for the Privacy Act's grandfather provision.

34.    Virginia did not uniformly require a full SSN for voter registration before 1975. *See To Amend Title 5, United States Code, to Provide that Individuals be Apprised of Records Concerning Them Which Are Maintained by Government Agencies: Hearing on H.R. 9527 and Related Bills Before the Subcomm. of the H. Comm. on Government Operations*, 92nd Cong. 166 (1972) ("H.R. 9257 Hearing") (reflecting statement from a citizen that "Article II, section 2 of the constitution of the Commonwealth of Virginia requires that a citizen registering to vote give his social security number as identification. To date I have refused . . . and have been permitted to vote on three different occasions."). Furthermore, Virginia was still working to create a central voter registration system using the SSN as late as 1974. *See To Amend Title 5, United States Code, to Provide that Persons be Apprised of Records Concerning Them Which Are Maintained by Government Agencies: Hearings on H.R. 12206 and Related Bills Before the Subcomm. of the H. Comm. on Government* Operations, 93rd Cong. 171 (1974) ("H.R. 12206 Hearing") ("And we understand that in at least one State—Virginia—the State Board of Elections is constructing a central voter registration roster based on the SSN."). Consequently, Virginia does not fall within the scope of the grandfather provision of the Privacy Act and that Act forbids it from requiring a full SSN for voter registration. *See, e.g.*, *Schwier v. Cox*, 412 F. Supp. 2d 1266, 1272–74 (N.D.

Ga. 2005).

35.     When Congress passed the Privacy Act more than four decades ago, it recognized the sensitivity of SSNs and the need to protect that information. *See* S. Rep. No. 93-1183, *reprinted in* 1974 U.S.C.C.A.N. 6916, 6943 (identifying the widespread use of SSNs in the public and private sectors as "one of the most serious manifestations of privacy concerns in the Nation").

36.     Over the past four decades, the privacy interest in one's SSN has grown exponentially, as have the risks associated with its unauthorized exposure. This growth is due in no small part to the fact that, in the modern era, Americans conduct so much of their personal and professional lives online.

37.     Nearly two decades ago, the Fourth Circuit recognized that "an individual's concern over his SSN's confidentiality and misuse has become significantly more compelling." *Greidinger v. Davis*, 988 F.2d 1344, 1353 (4th Cir. 1993). Even before the widespread use of the internet, the court recognized that an unscrupulous individual could inflict significant damage when armed with the SSN of another. *See id.*

38.     Today, when a person's full SSN is compromised, the consequences can be catastrophic, encompassing not only financial identity theft—which can itself be ruinous—but also government identity theft, criminal identity theft, and medical identify theft.

39.     In other words, if unauthorized individuals gain access to another person's full SSN, the immediate potential for mayhem is nearly limitless: the victim becomes vulnerable to perpetrators stealing their tax refunds, collecting their benefits and income, obtaining credit and loans in their name, using their health insurance, and even exposing the victim to prosecution for the crimes of the thieves.

40.     Undoing the harm caused by a malevolent actor armed with one's full SSN can be

nearly impossible. For better or worse, Americans' identities are increasingly tied to those nine digits, making them among some of the most important—and potentially vulnerable—personal data that each person has.

41.     Today, U.S. citizens are increasingly aware of the dangers associated with sharing their SSN. In 2014, respondents to a poll conducted by the Pew Research Center overwhelmingly rated their SSN as more sensitive than information about the state of their health and the medicines they take; the content of their phone conversations, text messages, and emails; their birth date; their internet search history; and their political views and the candidates they support. *See* Mary Madden, *Americans Consider Certain Kinds of Data to be More Sensitive than Others*, Pew Research      Center      (Nov.      12,      2014),      *available      at* https://www.pewresearch.org/internet/2014/11/12/americans-consider-certain-kinds-of-data-to-be-more-sensitive-than-others/.

42.     Both the federal government and Virginia itself strongly advise Americans against giving out their full SSN unless absolutely necessary, and never to someone unknown. Virginia even specifically distinguishes SSN information from other personal identifier information as being of a heightened security concern by explicitly prohibiting disclosure and use of SSNs obtained from voter registration applications, with few specific exceptions. *See* Va. Code Ann. §§ 24.2-407.1, 24.2-416.5.

43.     The need to limit SSN disclosure is not news to anyone who has been paying attention. Over the past several decades, Americans have been increasingly unwilling to share their SSN with others.

44.     In the early 1990s, for example, about 60% of respondents to the General Social Survey were willing to provide their full SSN to the survey. But by 2010, only about 20% of

respondents were willing to provide such information to interviewers. *See* Jibum Kim, et. al, *Trends and Correlates of Consenting to Provide Social Security Numbers*, 27 FIELD METHODS 348 (2015).

45.   Reticence to sharing SSNs has become so widespread that even government agencies have faced significant obstacles to collecting individuals' information when that information is tied to an SSN.

46.   The Census Bureau, for example, previously requested full SSNs in its interviews with Census respondents. But as the Social Security Administration explains, over the past few decades, "survey respondents [to the Census] have become increasingly reluctant to provide their SSNs to survey data collectors" because of their perceived "opportunity to commit identity theft." *See* Jennifer McNabb et al., *Uses of Administrative Data at the Social Security Administration*, 69 SOCIAL SECURITY BULLETIN 1, https://www.ssa.gov/policy/docs/ssb/v69n1/v69n1p75.html.

47.   Over time, response rates to the Census dropped so dramatically that the Census, "[r]eacting to [the] expanding SSN nonresponse problem," was forced to drop the requirement altogether to ensure the Census's overall data would not be compromised by lower response rates. *Id.*

48.   U.S. citizens' hesitation to share their SSNs for voting in particular has found additional justification in recent government disclosures highlighting insufficient security measures in state elections systems and the resulting vulnerability to hacking and breaches.

49.   Specifically, the U.S. Senate Intelligence Committee recently concluded that foreign state actors attempted to infiltrate the elections systems of all 50 states in advance of the 2016 presidential election. U.S. Senate, Report of the Select Comm. on Intelligence, 116th Cong., Rep. on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election Volume

1: Russian Efforts Against Election Infrastructure with Additional Views (2019), https://www.intelligence.senate.gov/sites/default/files/documents/Report_Volume1.pdf.

50.     In at least 21 states, hackers attempted to gain access to voter registration databases—each of which typically contains personally identifiable information, including the partial or full SSN of that state's voters. In at least two of those states, the hackers successfully gained access to the state's voter registration database. In Illinois, for example, hackers gained access to hundreds of thousands of partial SSNs from those voters' registration records. *Id.* at 22.

51.     In light of the attacks on state election systems leading up to the 2016 presidential election, the Senate Intelligence Committee now considers state voter registration databases to be highly vulnerable to attack. *Id.* at 56-7.

52.     U.S. officials expect additional attacks in future elections. *See, e.g.*, Nat'l Conference of State Legislatures, *Don't Sleep on Election Cybersecurity (Cyber Criminals Won't)* (April 6, 2021), https://www.ncsl.org/research/elections-and-campaigns/don-t-sleep-on-election-cybersecurity-cyber-criminals-won-t-magazine2021.aspx.

53.     The Virginia Department of Elections' website claims that "Russian hackers scan[ned] Virginia's voting systems looking for weaknesses" in 2016. *Democracy Defended: Verified Secured, Counted: Our Defenses. Your Security*, Virginia Department of Elections, https://www.elections.virginia.gov/defend-democracy/ (last visited Dec. 7, 2021). It further claims that "[w]hile [the hackers were] unable to access the state's election infrastructure, the attempt underscored the need to invest in a more secure system with verification failsafes and backup." *Id.* The website claims that Virginia now uses paper ballots as backup to provide "an auditable trail of proof" and touts that "electronic pollbooks and voting machines are NEVER connected to the internet on Election Day." *Id.* There is, however, no mention of measures taken to protect voter

registration data, including SSNs, from cyber threats. *See id.*

54.     Beyond foreign state interference, state voter registration systems are broadly vulnerable to access by unauthorized third parties domestically. Breaches can occur not just by domestic hackers, but also by the inadvertent loss or theft of personal electronic or storage devices, simple administrative error, or abuse of network privileges.

55.     These vulnerabilities are especially disconcerting in Virginia because the Commonwealth is an extreme outlier—one of only three states—that uses the full, nine-digit SSN for voter registration.

56.     Unlike a data breach in a state that utilizes only the last four digits of a SSN or some other identifying number, a data breach in Virginia would expose registered voters to identity theft almost instantaneously.

57.     For all these reasons, Virginia's Full SSN Requirement inhibits voter registration and constrains Plaintiffs' ability to successfully associate with voters who would support their candidates in Virginia elections.

58.     It is axiomatic that, to win an election, a political party must convince voters to turn out and vote for their preferred candidates. But even the most persuasive campaign is limited in its ability to succeed if the pool of registered voters is unjustifiably limited by overly burdensome hurdles to voter registration.

59.     Research shows that voter registration drives demonstrably increase the number of voters who register and participate in an election. Voter registration drives reach voters who would not have registered but for that personal contact from a volunteer or campaign. *See* David W. Nickerson, *Do Voter Registration Drives Increase Participation? For Whom and For When?*, 77 THE JOURNAL OF POLITICS, 1, 88 (2015).

60. Voter registration drives bridge inevitable gaps in registration and especially are necessary to reach pockets of voters in communities who often are underserved by the methods of voter registration offered directly by the state or its agencies.

61. Though Virginia permits online registration, not all potential voters in Virginia can simply go online to register, as a substantial percentage of Virginia residents lack even basic internet service. *See, e.g.*, Ledyard King and Mike Stucka, *In Tri-City area, many still lack broadband access*, The Progress-Index (July 7, 2021), https://www.progress-index.com/story/news/2021/07/07/gda-broadband-local-va-npri-petersburg-hopewell-colonial-heights-virginia-no-broadband-access/47205013/ (noting that, in 64 of Virginia's 127 counties, "no more than 27% of households actually have high-speed [internet] access").

62. Additionally, to be eligible to register to vote online in Virginia, one must have a valid Virginia driver's license or state ID. *See* Va. Dep't of Elections, *What are the Requirements to Register Online?*, https://vote.elections.virginia.gov/Registration/DmvLookup. Low-income individuals, young individuals, and recent transplants to Virginia—groups that are less likely to be registered to vote in the first place—are also among the populations most likely to lack such an ID and the opportunity for face-to-face interactions with state offices that can register voters. These groups are frequently the targets of voter registration drives.

63. Certain populations substantially rely on traditional voter registration drives—and the corresponding in-person interaction with a political volunteer or canvasser—to register to vote. Black voters, for example, are over twice as likely as white voters to rely on a voter registration drive to register to vote. *See* CENSUS BUREAU, *Voting and Registration in the Election of November 2016, Table 12: Method of Registration by Selected Characteristics* (May 2017), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html.

64.     Sometimes, voter registration drives take the form of door-to-door activities; other times, they are part of larger community events. In all cases, the Full SSN Requirement requires volunteers and canvassers to convince strangers to entrust them with their full, nine-digit SSN.

65.     Unsurprisingly, many potential voters are simply unwilling to give their SSN to a stranger conducting a voter registration drive. Despite the low risk that a volunteer will use their SSN for nefarious purposes, or that the form upon which they provide their SSN will be lost, misplaced, or the information wrongfully intercepted, many potential voters simply conclude that the risk is not worth taking.

66.     Other voters, particularly young voters, do not know their full SSNs and are unable to provide them.

67.     The difficulties presented by the Full SSN Requirement do not end when a volunteer or canvasser convinces a potential voter to hand over their full SSN to a stranger. Instead, the volunteer or canvasser (or their associated organization) has another problem: the potential legal liability incurred by collecting, maintaining, and transmitting individuals' SSNs.

68.     While DPVA is respectful of and cautious with all personal data, the potential legal liability associated with SSNs places increased and undue burdens on DPVA with respect to the storage, transportation, and transfer of voter registration forms to the general registrar. Indeed, DPVA strives to limit its liability for this SSN information by ensuring the rapid transfer of paper registration forms to the general registrar, which can be challenging due to logistical fluctuations in staffing, transportation, location, and event schedules.

69.     This increased liability also leads to significant difficulties finding vendors willing to undertake voter registration drives. For example, in South Carolina—which required a full SSN for voter registration purposes until last year when it agreed to discontinue the practice after it was

sued by DCCC over the requirement, *see S.C. Democratic Party, et al. v. Andino, et al.*, No. 3:19-cv-03308-JMC, 2020 WL 410120 (D.S.C. Jan. 24, 2020)—DCCC previously had significant difficulty finding a third-party vendor that would agree to conduct voter registration activities in the state and accept any degree of liability for its staff collection of registration forms with the SSN.

70.     Between individuals' increasing unwillingness to share their SSNs with others and the corresponding legal liability of individuals and organizations that obtain that information as part of voter registration work, the Full SSN Requirement creates an onerous burden on voter registration activities within the Commonwealth.

71.     Virginia has no need to impose these burdens on voters or organizations that would associate with them or conduct voter registration drives.

72.     Presumably, Virginia requires applicants to provide their SSN when they register to vote to assist the state in identifying and verifying those applicants' eligibility to vote. But a full SSN is unnecessary to fulfill that purpose.

73.     When Congress passed the Help America Vote Act, Pub. L. No. 107–252, Title III, § 302, 116 Stat. 1706-08 (codified at 42 U.S.C. § 15301 et seq.) ("HAVA"), in 2002, it recognized that states must be able to verify applicants' eligibility to vote before adding them to the state's voter registration rolls. To do so, Congress instructed states to confirm an applicant's eligibility to vote with that individual's driver's license number, or, if that number was unavailable, the *last four digits* of that individual's SSN. Thus, HAVA implicitly recognizes that a full SSN is not necessary to verify an individual's eligibility to vote.

74.     Today, almost all states and the District of Columbia successfully verify applicants' eligibility to vote with some identifying number besides a person's full SSN.

## II.     Virginia's Inequitable Notice and Cure Process

75.     The second aspect of Virginia's election laws at issue in this action is the process by which Virginia informs and allows voters to cure absentee ballots flagged for rejection due to technical defects that are not related to the voter's actual eligibility to vote.

76.     All Virginia voters are eligible to vote absentee without a reason or excuse. *See* Va. Code Ann. § 24.2-416.1 (2020).

77.     Absentee ballots are far more likely to be thrown out than ballots cast in-person due to minor errors. *See generally* Michael R. Alvarez, Thad E. Hall, & Betsy Sinclair, *Whose Absentee Votes Are Returned and Counted: The Variety and Use of Absentee Ballots in California*, 27 Electoral Studies 673, 673-83 (2008).

78.     This is in large part because of additional hoops that voters may have to jump through in the absentee voting process, including information that they may be asked to provide on the return ballot envelopes. Different states have different rules that they apply to absentee voting, and different consequences if the information is missing or wrong or otherwise deemed inadequate.

79.     In Virginia, if certain technical information is missing from the voter's absentee ballot envelope, the ballot is subject to rejection. Such information includes (1) the voter's signature, (2) a witness signature, and/or (3) the voter's first or last name. Va. Code Ann. § 24.2-707(A); Va. Admin. Code § 20-70-20(B). Other technical defects that will void a ballot include if the voter's address is missing, or if the address is so incomplete that it cannot be determined. Va. Admin. Code § 20-70-20(B), (C).

80.     Virginia deems curable all technical defects on an absentee envelope that could result in a ballot's rejection, making notice that a ballot has been flagged for rejection—and that a cure process is available to save the ballot and ensure it is counted—critical to a voter's ability to

successfully vote absentee. *See* Va. Code Ann. § 24.2-709.1(C).

81.     Voters have until noon on the Friday after election day to cure a ballot that has been flagged for rejection for a technical defect; if the ballot is not cured by that Cure Deadline, it will be rejected and not counted. *Id.*

82.     Not all voters, however, are notified that their ballots have been flagged for rejection due to a technical defect, or that they have the right to cure a defect by the Cure Deadline and save their ballot from rejection.

83.     The deadline for submitting absentee ballots in-person or to a drop-off location is 7:00 p.m. on election day. *Id.* § 24.2-709(A). Absentee ballots returned by mail are considered timely if they are postmarked by election day and received by noon on the third day after election day. *Id.* § 24.2-709(B).

84.     Only voters who return their absentee ballots by the Notice Cutoff, *four days before election day*, are guaranteed to receive notice of and an opportunity to cure any technical defect that officials may identify to invalidate and reject a ballot. *Id.* § 24.2-709.1(C).

85.     Specifically, for voters whose ballots are received by the Cutoff, the registrar *must* "notify the voter in writing or by email of the error or failure and shall provide information to the voter on how to correct the issue so his ballot may be counted." *Id.* Officials have three days to comply with this requirement and notify an affected voter of a defect from the time the officials identify it. *Id.*

86.     By contrast, those voters who timely return their absentee ballots but whose ballots are not received until after the Notice Cutoff—i.e., voters whose ballots are received sometime between three days before the election day and three days after—are *not* afforded the same guaranteed notice and opportunity to cure the exact same technical defects as voters whose ballots

- 23 -

are received at the pre-four-day mark.

87.     Whether to provide *any* notice to voters whose ballots are received after the Notice Cutoff is left to the discretion of officials. Some have exercised this discretion to continue to provide notice of curable technical defects to affected voters up until the Absentee Ballot Return Deadlines or the Cure Deadline.

88.     The Commonwealth has accordingly created four classes of voters who get different notice of technical defects on their ballots and different opportunities to cure based on arbitrary deadlines and the whims of local officials:

- Voters whose absentee ballots are received before the Notice Cutoff, who are required by law to receive notice and an opportunity to cure up until the Cure Deadline;

- Voters whose absentee ballots are received after the Notice Cutoff but before the Cure Deadline and live in counties where local elections officials choose to continue to provide notice after the Notice Cutoff, who still receive notice of their technical defects and may cure their ballots up until the Cure Deadline;

- Voters whose absentee ballots are received after the Notice Cutoff but before the Cure Deadline and live in counties where local elections officials choose not to continue to provide notice after the Notice Cutoff, who receive no notice of the technical defects with their ballots; and

- Voters whose absentee ballots are received at or on the Mail Deadline, who—regardless of their local elections official's practices—have no meaningful cure opportunity due to the arbitrary synchronization of the Mail Deadline and the Cure Deadline.

89.     These risks are not merely hypothetical. In the 2021 election, thousands of Virginians timely returned absentee ballots that the Commonwealth only received after the Notice Cutoff and even after election day. The Inequitable Notice and Cure Process leaves each of those Virginians whose absentee ballots have a technical infirmity without the same notice and opportunity to cure as their fellow citizens who returned ballots early.

90.     The disenfranchisement and denial of due process and equal protection caused by

the Inequitable Notice and Cure Process is not justified by any legitimate—let alone compelling—state interest.

91.     The Inequitable Notice and Cure Process does not further any fraud-protection or election-security interest held by the Commonwealth. Giving all voters who have returned their absentee ballots by the Absentee Ballot Return Deadlines notice of and a meaningful opportunity to cure technical ballot defects does not require electoral boards to accept defective ballots; it simply provides all absentee voters with an equal opportunity to cure their ballots and have them counted.

92.     Virginia already has a process in place for notifying absentee voters whose absentee ballots are ineligible due to technical defects (such as failure to sign the absentee ballot envelope or missing name, witness signature, or decipherable address), and for allowing those voters to fix these technical omissions or errors.

93.     Notifying all absentee voters who timely return their ballots by the applicable Absentee Ballot Return Deadlines that their ballots risk rejection due to technical defects and providing them a reasonable opportunity to cure would also not impose a significant administrative burden on local elections administrators.

94.     Local elections administrators are *already required* to provide notice and an opportunity to cure to voters whose absentee ballots are received by the Notice Cutoff. *Id.* And local elections administrators need not ascertain their final vote count until ten days after the Mail Deadline, giving administrators ample time to both provide all voters whose absentee ballots are received by the Mail Deadline an equal and meaningful opportunity to cure technical defects and still discharge their statutory responsibilities in a timely manner. *See id.* § 24.2-679(A).

- 25 -

## CLAIMS FOR RELIEF

### COUNT I
### First Amendment - Freedom of Speech and Association
### U.S. Const. Amend. I; 42 U.S.C. §§ 1983, 1988; 28 U.S.C. §§ 2201, 2202
### Virginia's Full SSN Requirement
### (By all Plaintiffs as to all Defendants)

95.     Plaintiffs reallege and incorporate by reference paragraphs 1–74 of this Complaint as though fully set forth herein.

96.     The Full SSN Requirement chills Plaintiffs' First Amendment rights in two distinct ways. First, it hinders Plaintiffs' ability to conduct voter registration activities in the state. Voter registration drives implicate expressive and associational rights of the parties who engage in voter registration. Second, it hinders Plaintiffs' associational rights by making it harder for them to successfully associate with voters who would support Democratic candidates in Virginia.

97.     The First Amendment requires vigilance "to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 192 (1999). The Supreme Court has applied "exacting scrutiny" to review laws governing election-related speech. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995); *see also League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019) ("[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'") (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)). Restrictions on such speech are unconstitutional when they "significantly inhibit" election-related speech and association and were "not warranted by the state interests . . . alleged to justify [the] restrictions." *Buckley,* 525 U.S. at 192.

98.     At its most fundamental level, a voter registration drive involves "encourag[ing] . . . citizens to register to vote." *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 698 (N.D. Ohio 2006). "[E]ncouraging others to register to vote" is "pure speech." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012). And because that speech is "political in nature," "it is a core First Amendment activity." *Hargett*, 400 F. Supp. 3d at 720 (quotation marks omitted). Like circulating an initiative petition for signatures, registering voters is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988).

99.     The Full SSN Requirement hinders Plaintiffs' ability to engage in this type of speech in Virginia. At a minimum, Plaintiffs must implement complex administrative procedures to ensure that individuals' SSNs are not compromised if they choose to conduct voter registration activities. Because of the disclosure requirement, Plaintiffs also struggle to find canvassers who are willing to participate in voter registration activities because doing so requires those individuals to ask potential voters to provide highly personal and sensitive information about themselves. Some canvassers are uncomfortable requesting and possessing this sensitive information. These fears are well founded because, like Plaintiffs, canvassers face potential legal liability associated with collecting, maintaining, and transmitting individuals' SSNs. Still others may be discouraged from participating fully in voter registration drives because of potential voters' unwillingness to disclose their full SSNs. The SSN disclosure requirement thus unconstitutionally "limits the number of voices" available to convey Plaintiffs' message and ultimately "limits the size of the audience they can reach." *Id.* at 422–23.

100.     The Full SSN Requirement also violates Plaintiffs' freedom of association. "[O]rganizing between individuals in support of registration efforts involves political association

that is, itself, protected under the First Amendment." *Hargett*, 2019 WL 4342972, at *8. "Where groups, formal or informal, seek to advance their goals through the electoral process, regulations preventing their members from [participating in voter registration] impair their ability effectively to organize and make their voices heard." *Hernandez v. Woodard*, 714 F. Supp. 963, 973 (N.D. Ill. 1989) (citing *R.I. Minority Caucus, Inc. v. Baronian*, 590 F.2d 372, 376–77 (1st Cir. 1979)).

101.    The Full SSN Requirement violates Plaintiffs' freedom of association by inhibiting and limiting the pool of registered voters who associate with the Democratic Party in Virginia. To succeed in their missions, DCCC and DPVA rely on the association of registered voters to support the Democratic slate of political candidates. Between potential voters who are either unwilling or unable to provide the requisite SSN to register to vote, and increased logistical concerns aimed at protecting sensitive SSN data, DCCC's and DPVA's efforts to associate with new voters are hampered. The deterrent effect is particularly impactful among Virginia's Black and college-age populations, who are more likely to benefit from voter registration drives and are more likely to associate with Democratic organizations. As Virginia's very recent history has demonstrated, even one vote can change the outcome of an election: every voter, and every potential voter, counts.

102.    "'Laws that burden political speech' are [] generally subject to strict scrutiny." *Fusaro v. Cogan*, 930 F.3d 241, 248–49 (4th Cir. 2019) (citing *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). To survive strict scrutiny, the law must be necessary to serve a compelling state interest and narrowly drawn to achieve that end. *See id.* at 248. Similarly, laws that inhibit "[t]he right to associate for expressive purposes" may only be justified by "compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

103.    "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021) (quoting *NAACP v. Button,* 371 U.S. 415, 433 (1963)). Laws that "'create an unnecessary risk of chilling' [association] in violation of the First Amendment" may not apply "indiscriminately" across the board to create a "deterrent effect feared by [challenging] organizations that is real and pervasive," even if the harm is not universal. *Id.* at 2388 (quoting *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 968 (1984)).

104.    Virginia has, no doubt, a legitimate state interest in maintaining accurate voter lists. But the Full SSN Requirement is far from the least restrictive means of achieving that state interest. When Congress passed HAVA in 2002, it instructed states to confirm an applicant's eligibility to vote with that individual's driver's license number, or, if that number was unavailable, the *last four digits* of that individual's SSN.

105.    In passing HAVA, Congress thus concluded that a full SSN was not necessary to verify an individual's eligibility to vote. Today, most states and the District of Columbia successfully verify applicants' eligibility to vote with some identifying number besides a person's full SSN. Virginia's Full SSN Requirement is thus simply not the least restrictive means to maintain accurate voter registration lists.

106.    And "[i]f the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973).

107.    Nor can the Full SSN Requirement be justified by administrative ease. While it may be marginally easier for Virginia to continue its current SSN disclosure requirement than it would

be to identify voters through the last four digits of a SSN or some other identifying number, Plaintiffs' rights of speech and association are significantly chilled by the Full SSN Requirement, and concerns of "administrative convenience" cannot justify the deprivation of those constitutional rights. *Taylor v. Louisiana*, 419 U.S. 522, 535 (1975).

108.    DCCC's and DPVA's fear that the Full SSN Requirement will deter association and chill their First Amendment rights is real and pervasive. While some potential voters who want to associate with DCCC and DPVA may still be willing to provide their SSN in order to complete Virginia's voter registration process, some will not; nonetheless, Virginia's Full SSN Requirement applies indiscriminately across the board. *See Bonta*, 141 S. Ct. at 2388. Concerns over SSN security are valid and widespread. Beyond mounting general concern in an increasingly electronic world, the federal government deems voter registration databases a specific target of cyber hackers. *See* U.S. Senate, Report of the Select Comm. on Intelligence, 116th Cong., Rep. on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election Volume 1: Russian Efforts Against Election Infrastructure with Additional Views (2019), at 56–57, https://www.intelligence.senate.gov/sites/default /files/documents/Report_Volume1.pdf.

109.    Virginia's attempt to maintain confidentiality by limiting dissemination of SSNs collected through voter registration applications is insufficient. Prohibitions on dissemination of SSNs do not eradicate the unnecessary risk to voters' SSNs, especially from cyber-attacks or accidental exposure. Nor do they remove the violations of Plaintiffs' constitutional rights. *See Bonta*, 141 S. Ct. at 2388 ("While assurances of confidentiality may reduce the burden of disclosure to the State, they do not eliminate it.").

**COUNT II**
**Civil Rights Act Materiality Claim**
**52 U.S.C. § 10101(a)(2)(B), 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Virginia's Full SSN Requirement**
**(By all Plaintiffs as to all Defendants)**

110.     Plaintiffs reallege and incorporate by reference paragraphs 1–74 of this Complaint as though fully set forth herein.

111.     The Civil Rights Act provides, in relevant part, that "[n]o person . . . shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any . . . registration, . . . if such error or omission is not *material* in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (emphasis added).

112.     This federal statute was "intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018) (quotation marks omitted).

113.     In *Martin*, for instance, the court held that the plaintiffs had a substantial likelihood of prevailing on their Civil Rights Act Materiality Claim because "a voter's ability to correctly recite his or her year of birth on the absentee ballot envelope [was] not material to determining said voter's qualifications under Georgia law." *Id.* at 1308–09.

114.     Under Virginia law, individuals who meet the following five criteria are eligible to vote: (1) be a U.S. citizen; (2) be at least 18 years old before the next election; (3) be a resident of Virginia; (4) not be declared mentally incompetent; and (5) not have been convicted of a felony, unless their civil rights have been restored by the Governor. Va. Const. art. II, § 1.

115.     Whether an individual has disclosed their full SSN is unrelated to any of the five eligibility requirements and is, therefore, immaterial to whether they are eligible to vote in Virginia. Yet Virginia mandates that applicants include their full SSN and rejects any voter registration application that does not include the full SSN. *See id.* § 2.

116.     Potential voters whose voter registration applications are denied or not processed because they do not contain complete SSNs are denied the right to vote for reasons immaterial to their qualifications to vote.

117.     Similarly, potential voters who elect not to register to vote solely because Virginia requires a full SSN number to complete registration are denied the right to vote based on an issue immaterial to their eligibility to vote.

118.     Plaintiffs bring this claim on their own behalf, as well as on behalf of their members, constituents, and supporters, who are denied the right to vote based on an issue immaterial to their eligibility and qualifications to vote.

**COUNT III**
**Privacy Act Claim**
**Section 7 of the Privacy Act of 1974, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Virginia's Full SSN Requirement**
**(By all Plaintiffs as to all Defendants)**

119.     Plaintiffs reallege and incorporate by reference paragraphs 1–74 of this Complaint as though fully set forth herein.

120.     Section 7(a)(1) of the Privacy Act of 1974 makes it unlawful for a state to deny individuals the right to vote if they refuse to disclose their SSN. A state may be excused from this law only if it *required* the disclosure of SSNs to verify individuals' identities before January 1, 1975. Section 7(a)(2)(B).

121.     Defendants bear the burden of demonstrating that they are exempt from the Privacy

Act's prohibition on conditioning the right to vote on SSN disclosure. *See Schwier v. Cox*, 412 F. Supp. 2d 1266, 1271 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006).

122. Defendants cannot demonstrate that the disclosure of an individual's SSN was (1) "required" and (2) used "to verify the identity of an individual" for voter registration purposes in Virginia before January 1, 1975.

123. Disclosure of a SSN was not universally required for voter registration in Virginia before January 1, 1975. Specifically, not all county registrars automatically rejected applications lacking SSNs. *See* H.R. 9257 Hearing at 166. And Virginia did not even create a voter registration roster based on SSNs until sometime in or after 1974. *See* H.R. 12206 Hearing at 171.

124. Accordingly, Virginia's use of the Full SSN Requirement to register voters violates the Privacy Act.

**COUNT IV**
**Denial of Procedural Due Process**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
**Virginia's Inequitable Notice and Cure Process**
**(By all Plaintiffs as to all Defendants)**

125. Plaintiffs reallege and reincorporate by reference paragraphs 1–26 and 75–94 as though fully set forth herein.

126. To determine whether a plaintiff has been denied procedural due process in violation of the Due Process Clause of the Fourteenth Amendment, a court first asks whether a constitutionally protected liberty interest is at stake. If so, the court then determines whether the procedural protections provided are sufficient by examining, "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

127.    The right to vote is a fundamental constitutional right. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966). "Other rights, even the basic, are illusory if the right to vote is undermined." *Weberry v. Sanders*, 376 U.S. 1, 17 (1964). Because Virginia allows all registered voters to exercise their fundamental right to vote by mail, there is a constitutionally protected liberty interest involved in the process of casting an absentee or mail-in ballot and in having that ballot counted. *See, e.g.*, *Democracy N.C., et.al. v. N.C. State Bd. of Elections*, 476 F. Supp 3d 158, 227 (M.D.N.C. 2020) (holding that "North Carolina, having 'authorized the use of absentee ballots,' must afford appropriate due process protections to the use of the absentee ballots"); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018) ("Courts around the country have recognized that '[w]hile it is true that absentee voting is a privilege and a convenience to voters, this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege.'") (quoting *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990)); *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at *5 (N.D. Ill. Mar. 13, 2006) ("The right to vote by absentee ballot is not, in and of itself, a fundamental right. But once the State permits voters to vote absentee, it must afford appropriate due process protections, including notice and a hearing, before rejecting an absentee ballot."). As a result, Defendants may not disregard an absentee or mail-in ballot without providing adequate procedures.

128.    Virginia's Inequitable Notice and Cure Process erroneously deprived eligible voters of their ability to cast a ballot in the 2021 general election and will deprive voters of their ability to vote by absentee ballot in future elections.

129.    Affording to all Virginia voters the same procedural safeguards to cure technical

defects on ballot envelopes that Virginia already affords to absentee voters whose ballots are received by the Notice Cutoff would go far in safeguarding against that disenfranchisement. The need for *pre-deprivation* notice for all Virginia voters is particularly vital, moreover, because disenfranchisement is an irreparable injury. Accordingly, Virginia must provide notice of curable defects to all voters who timely return ballots on or before the Absentee Ballot Return Deadlines and whose ballots are timely received according to the method of return. In other words, the Notice Cutoff must be amended to match the Mail Deadline.

130.    Similarly, the cure deadline must occur after the Mail Deadline. Because officials are afforded three days within which to send notice of a curable defect to a voter, it is appropriate to move the cure deadline to seven calendar days after the election. This deadline would permit officials up to three days to issue notice to voters whose ballots are received by the Mail Deadline and still allows such voters a minimum of one day within which to respond to that notice and cure the defect. Such an amended cure deadline would also match the deadline imposed on local electoral boards to review and determine the validity of provisional ballots. *See* Va. Code Ann. § 24.2-653.01(A).

131.    Providing notice and a meaningful opportunity to cure to *all* voters whose timely ballots would otherwise be rejected due to a curable technical defect would impose little to no additional fiscal or administrative burden on local electoral boards. Local electoral boards are already required to provide such notice and cure opportunity to absentee voters whose ballots are received by the Notice Cutoff. *See id.* § 24.2-709.1(C). And as some counties have demonstrated in past elections, it is feasible to continue to provide notice until the Mail Deadline. Counties need not ascertain their final vote count until ten days after the Mail Deadline. *See id.* § 24.2-679(A). Thus, revision of the process in this way would protect against disenfranchisement of lawful

voters, while respecting the administrative needs of the state.

132.    In contrast to the beneficial results of this simple solution, thousands of Virginians, including Plaintiffs' members, constituents, and supporters, will be denied due process and suffer direct and irreparable injury if Defendants continue to enforce the Inequitable Notice and Cure Process. Without relief from this Court, these voters will be deprived of their right to vote in future elections in which the Inequitable Notice and Cure Process remains in place, and Plaintiffs' missions and efforts will be irreparably frustrated and hindered.

**COUNT V**
**Unconstitutional Burden on the Right to Vote**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
**Virginia's Inequitable Notice and Cure Process**
**(By all Plaintiffs as to all Defendants)**

133.    Plaintiffs reallege and reincorporate by reference paragraphs 1–26 and 75–94 as though fully set forth as though fully set forth herein.

134.    Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, state or local officials cannot implement election practices that unduly burden the right to vote. To determine whether such action imposes an undue burden on the right to vote in violation of the First and Fourteenth Amendment, federal courts apply the *Anderson-Burdick* balancing test. If the burden is severe, the policy imposing that severe burden "must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But even if the burden is less than severe, the court asks whether a state interest justifies the burden imposed, by "weigh[ing] 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary

- 36 -

to burden the plaintiff's rights.'" *Id.* at 434 (quoting *Anderson*, 460 U.S. at 789).

135. Virginia's Inequitable Notice and Cure Process imposes a severe burden—disenfranchisement—on the right to vote, and serves no legitimate (or compelling) state interest. Refusing to provide all absentee voters with notice of and a meaningful opportunity to cure technical ballot defects does not save significant administrative costs, as the electoral boards are already required (and do) provide notice and an opportunity to cure absentee ballots that are received by the Notice Cutoff. Nor does the Inequitable Notice and Cure Process prevent voter fraud: after providing all voters notice of and an opportunity to cure technical defects, the electoral boards would still be fully empowered to reject those voters' ballots if they do not satisfy all applicable requirements.

136. Because Defendants' enforcement of the Inequitable Notice and Cure Process imposes severe burdens on eligible voters' ability to have their votes counted that are not justified by any countervailing state interest, they violate Virginians' rights under the First and Fourteenth Amendments to the U.S. Constitution.

137. Thousands of Virginians, including Plaintiffs and Plaintiffs' members, constituents, and supporters, will be unduly burdened and suffer direct and irreparable injury if Defendants are permitted to continue enforcing Virginia's Inequitable Notice and Cure Process. Without relief from this Court, these voters will be deprived of their right to vote in the upcoming 2022 elections and beyond, and Plaintiffs' missions and efforts will be irreparably frustrated and hindered.

## COUNT VI
### Unconstitutional Burden on the Right to Vote
### U.S. Const. Amend. XIV, 42 U.S.C. § 1983
### Virginia's Full SSN Requirement
### (By all Plaintiffs as to all Defendants)

139.     Plaintiffs reallege and incorporate by reference paragraphs 1–74 of this Complaint as though fully set forth herein.

140.     Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, state or local officials cannot implement election practices that unduly burden the right to vote. To determine whether such action imposes an undue burden on the right to vote in violation of the First and Fourteenth Amendment, federal courts apply the *Anderson-Burdick* balancing test. If the burden is severe, the policy imposing that severe burden "must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But even if the burden is less than severe, the court asks whether a state interest justifies the burden imposed, by "weigh[ing] 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 434 (quoting *Anderson*, 460 U.S. at 789).

141.     Virginia's Full SSN Requirement imposes severe burdens on the right to vote. It serves no legitimate state interest, let alone a compelling one. Requiring voters to provide a full SSN to register to vote is risky, burdensome, and unnecessary. Voters are not required to have a SSN to be eligible to vote. Nor does the Commonwealth need a voter's full SSN to assess a person's eligibility to vote. Any such need is illusory, as the overwhelming majority of states are able to assess voter eligibility without a full SSN. Meanwhile, voters face real, well-known, and

increasingly salient risks if they are forced to disclose their full SSN, especially in the wake of recent attempts—some successful—to hack voter registration databases.

142.    Because Defendants' enforcement of the Full SSN Requirement imposes severe burdens on eligible voters' right to vote that are not justified by any countervailing state interest, they violate Virginians' rights under the First and Fourteenth Amendments to the U.S. Constitution.

143.    Thousands of Virginians, including Plaintiffs and Plaintiffs' members, constituents, and supporters, will be unduly burdened and suffer direct and irreparable injury if Defendants are permitted to continue enforcing Virginia's Full SSN Requirement. Without relief from this Court, these voters will face unconstitutional burdens in registering to vote in the upcoming 2022 elections and beyond, and Plaintiffs' missions and efforts will be irreparably frustrated and hindered.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a)    declaring that Virginia's Full SSN Requirement for voter registration violates the First Amendment to the U.S. Constitution;

b)    declaring that Virginia's Full SSN Requirement for voter registration violates the Civil Rights Act;

c)    declaring that Virginia's Full SSN Requirement for voter registration violates the Privacy Act;

d)    declaring that Virginia's Inequitable Notice and Cure Process violates the Due Process Clause of the Fourteenth Amendment;

e)    declaring that Virginia's Inequitable Notice and Cure Process constitutes an

unconstitutional burden on the right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution;

      f)      declaring that Virginia's Full SSN Requirement for voter registration constitutes an unconstitutional burden on the right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution;

      g)      permanently enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Full SSN Requirement;

      h)      ordering Defendants to immediately implement an updated voter registration system (including by updating the voter registration database, voter registration forms, and instructions regarding voter registration) that utilizes an alternative to the full SSN for voter identification and all future voter registration activities;

      i)      requiring Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, to provide notice to all voters whose timely absentee or mail-in ballots are to be rejected due to a curable technical defect;

      j)      permanently enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting any timely absentee or mail-in ballot due to a curable technical defect without providing the voter notice of that rejection and a meaningful opportunity to cure the defect;

      k)      awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988, 52 U.S.C. § 10310(e), and other applicable laws; and

      l)      granting such other and further relief as the Court deems just and proper.

Dated:        December 7, 2021                    Respectfully submitted,


                                                  By:

                                                   _/s/ Haley Costello Essig____ _____
                                                  Marc E. Elias*
                                                  Elisabeth C. Frost*
                                                  Haley Costello Essig, VA Bar No. 85541
                                                  John Geise *
                                                  Joel J. Ramirez*
                                                  Kathryn E. Yukevich, VA Bar No. 92621
                                                  Elias Law Group LLP
                                                  10 G St NE Ste 600
                                                  Washington, DC 20002
                                                  Telephone:  202.968.4490
                                                  Facsimile:  202.968.4498
                                                  MElias@elias.law
                                                  EFrost@elias.law
                                                  HEssig@elias.law
                                                  JGeise@elias.law
                                                  JRamirez@elias.law
                                                  KYukevich@elias.law

                                                  * Motions for Admission *pro hac vice*
                                                  forthcoming

                                                  *Counsel for Plaintiffs Democratic Party of
                                                  Virginia and DCCC*