**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| DEMOCRACTIC PARTY OF VIRGINIA AND DCCC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Case No. 3:21-cv-00756-HEH |
| ROBERT H. BRINK, in his official capacity as the Chairman of the Board of Elections, *et al.,* | ) ) ) | |
| Defendants, | ) ) | |
| v. | ) ) | |
| REPUBLICAN PARTY OF VIRGINIA, | ) ) | |
| Proposed Intervenor-Defendant | ) ) | |

**PROPOSED INTERVENOR-DEFENDANT THE REPUBLICAN PARTY OF
VIRGINIA's PROPOSED MOTION TO DISMISS**

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, the Republican Party of

Virginia ("Proposed Intervenor-Defendant") respectfully moves to dismiss the complaint in this

matter. This Motion is supported by a memorandum of law submitted herewith.

Counsel for Proposed Intervenor-Defendant has contacted counsel for the parties seeking their consent to this motion. Plaintiffs oppose Proposed Intervenor-Defendant's motion for intervention and Defendant neither consents nor opposes Defendant's motion for intervention.

Dated: January 12, 2022

Respectfully submitted,

By:/s/David A. Warrington
David A. Warrington (VSB No. 72293)
Dhillon Law Group Inc.
2121 Eisenhower Avenue, Suite 402
Alexandria, VA 22314
Telephone: 703.328.5369
Facsimile: 415.520.6593
dwarrington@dhillonlaw.com

Harmeet K. Dhillon*
Michael A. Columbo*
Dhillon Law Group Inc.
177 Post Street, Suite 700
San Francisco, CA 94108
harmeet@dhillonlaw.com
mcolumbo@dhillonlaw.com
*Admission pro hac vice forthcoming

*Counsel for Proposed Intervenor-Defendant
Republican Party of Virginia*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this action.

Dated: January 12, 2022

By: /s/David A. Warrington
David A. Warrington (VSB No. 72293)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| DEMOCRACTIC PARTY OF VIRGINIA AND DCCC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Case No. 3:21-cv-00756-HEH |
| ROBERT H. BRINK, in his official capacity as the Chairman of the Board of Elections, *et al.,* | ) ) ) | |
| Defendants, | ) ) | |
| v. | ) ) | |
| REPUBLICAN PARTY OF VIRGINIA, | ) ) | |
| Proposed Intervenor-Defendant | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF THE PROPOSED MOTION TO DISMISS BY THE REPUBLICAN PARTY OF VIRGINIA

Plaintiffs have failed to state claims upon which relief may be granted, and therefore the Court should dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The Plaintiffs assert that it is unlawful for a state to use a social a social security number ("SSN") in a voter registration application, but the Fourth Circuit has already approved Virginia's use of an SSN in its voter registration application. The Plaintiffs also contend that it is unconstitutional for Virginia to not spend a week after an election helping voters who mailed invalid absentee ballots at the last minute, through no fault of the state. Plaintiffs' theory conflicts with United States Supreme Court precedent, as well as Ninth and Eleventh Circuit precedents establishing that a voter is not unconstitutionally disenfranchised by their own errors.

Accordingly, the Republican Party of Virginia respectfully requests that the Court dismiss the Complaint.

**INTRODUCTION**

The Complaint asks this Court to hold that Article II, section 2, of the Virginia Constitution, a provision that has stood for nearly half a century, violates the United States Constitution, the Civil Rights Act, and the Privacy Act because it requires Virginia voters to provide their SSN to the state when registering to vote. The Complaint also asks the Court to find that Section 24.2-709.1 of the Virginia code violates the United States Constitution because it permits voters who submitted absentee ballots four or more days prior to an election to cure their ballots, but not those who submit their ballots fewer than four days prior to an election.

### A. The Fourth Circuit Has Approved Virginia's Requirement of Social Security Numbers in Voter Registration Applications

The first alleged problem identified in the complaint (Counts I, II III, and VI), is that voters are reluctant to trust Plaintiffs with their SSN for fear that plaintiffs will lose them or hackers will steal them. Though long on rhetoric, the Complaint does not cite a *single* case for the proposition that Virginia's requirement that voters provide a SSN with their registrations is unconstitutional, or violates any statute. Incredibly, the Complaint cites *Greidinger v. Davis* for the proposition that *misuse of* SSN's is a compelling concern (Compl. ¶ 37)—but fails to mention that in that very case the Fourth Circuit explicitly stated that Virginia's requirement of a SSN for a voting registration for internal purposes, *without releasing the SSN*, does not violate the Constitution or any law. 988 F.2d 1344, 1354 n.10 (4th Cir. 1993) ("Virginia's voter registration scheme imposes a substantial burden on Greidinger's fundamental right to vote only to the extent that the scheme permits the public disclosure of his SSN. If the scheme provided for only the receipt and internal use of the SSN by Virginia, no substantial burden would exist.").

The Complaint also baselessly ponders whether or not Virginia qualifies for the grandfather clause in the Privacy Act that exempts states that required SSNs before 1975. Compl. ¶¶ 32-34. Yet it fails to allege (because it cannot) any facts that, if true, demonstrate that Virginia did not require SSNs for voting registration before 1975. In fact, the state Constitution-based SSN requirement was approved by the voters in 1970 and became effective in 1971.

Although Plaintiffs would prefer to not have the burden of compliance with laws of general applicability that protect private information such as SSNs, like the Privacy Act of 1974, there is no special dispensation for political parties to avoid compliance. The costs of compliance are not an infringement on their or any other person's rights. Moreover, to the extent the Plaintiffs claim that privacy laws impose an undue and unconstitutional burden on them, or voters, then their suit should be directed at those privacy laws, not Virginia's constitution.

The finances of political parties and the information they must collect from voters is extremely regulated, on both the federal and state levels, and they routinely collect credit card information, checks, and other information that is also subject to extensive legal compliance obligations. Cherry-picking the burden of handling SSNs in Virginia is a manufactured crisis, not an *undue* burden on constitutional rights.

**B. The Constitution Does Not Require States to Spend One Week After an Election Helping Voters Correct Their Invalidating Errors on Their Mailed Absentee Ballots**

Plaintiffs acknowledge that voters have no constitutional right to an absentee ballot, and the Supreme Court and other federal circuit courts have held that the consequence of a voter's invalidating error is not a constitutional violation by a state. Yet, for absentee ballots mailed until the fourth day before the election, Virginia generously *guarantees* that it will help voters correct any errors they made that jeopardizes the validity of their mailed ballot. In Counts IV and V of

the Complaint, the Plaintiffs nonetheless ask the Court to find that Virginia has violated the Constitution by not going further, and asks the Court to order Virginia to spend the week after the election trying to help voters correct their errors. The costs, benefits, and consequences of choosing between alternative deadlines and guarantees beyond what the Constitution requires is inherently a legislative judgment call. There is no basis in law for the claim, which is contradicted by decisions of the Supreme Court as well as the Ninth and Eleventh Circuits.

I. **The Fourth Circuit Court of Appeals Has Already Held That Virginia's State Constitutional Requirement for an Individual to Provide Their "Social Security Number, If Any," to Register to Vote Does Not Violate the U.S. Constitution or Federal Civil Rights or Privacy Law**

A Complaint must "give the defendant fair notice of what the…claim is and the grounds upon which it rests," the complaint must have "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(internal quotations omitted). While the "pleading standard Rule 8 announces does not require detailed factual allegations" it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must "state a claim for relief that is plausible on its face" and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570; *see also Coleman v. Ma. Court of Appeals*, 626 F.3d 187 (4th Cir. 2010).

The Complaint alleges that Virginia imposes an unlawful barrier to voter registration that unjustifiably burdens not only the right to vote, but also Plaintiffs' rights of speech and association, the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), and the Privacy Act, 5 U.S.C. § 552a note. Compl. ¶ 2. This claim is foreclosed by a well-settled controlling Fourth Circuit Opinion that the state's requirement of an SSN on a voter registration application solely for its internal use does not meaningfully burden the right to vote. *Greidinger*, 988 F.2d at 1354 n.10

("Virginia's voter registration scheme imposes a substantial burden on Greidinger's fundamental right to vote only to the extent that the scheme permits the public disclosure of his SSN. If the scheme provided for only the receipt and internal use of the SSN by Virginia, no substantial burden would exist."). The Sixth Circuit similarly concluded that a Tennessee requirement for a SSN to register to vote did not violate any federal constitutional or statutory rights, including the Privacy Act of 1974, Civil Rights Act of 1964, the National Voting Rights Act, the constitutional right to vote, the due process rights under the 5th and 14th Amendments, and the Privileges and Immunities Clause of the 14th Amendment. *See McKay v. Thompson*, 226 F.3d 752, 754-757 (6th Cir. 2000).

### A.     The Complaint's Alleged First Amendment Claim in Count I is Meritless

Count I of the Complaint baselessly alleges that Virginia's SSN requirement violates Plaintiffs' First Amendment rights of freedom of speech and association, and 42 U.S.C. §§ 1983, 1988; 28 U.S.C. §§ 2201, 2202. The Complaint contends that "[t]he Full SSN Requirement chills Plaintiffs' First Amendment rights" for two reasons: the requirement "hinders Plaintiffs' ability to conduct voter registration activities in the state," which "implicate expressive and associational rights of the parties who engage in voter registration," and it "mak[es] it harder for them to successfully associate with voters[.]" Compl. ¶ 96.

The Fourth Circuit already held in *Greidinger* that Virginia's SSN requirement does not violate the voters' rights. 988 F.2d at 1354 n. 10. Plaintiffs have cited no precedent establishing that simply identifying information, which a state requires on its voter registration form, unconstitutionally infringes on the speech and association rights of *a person other than the voter*, and it is difficult to see how it could. Even if "encouraging others to register to vote" is "pure speech" that is "political in nature" and "a core First Amendment activity" or 'core political

speech,'" Compl. ¶ 98, Virginia's requirement that voters provide a SSN, if they have one, *to the state* to register to vote does not in any way stop Plaintiffs from encouraging people to vote or associating with them. Plaintiffs can still speak to and associate among themselves and with as many prospective voters as they desire. Likewise, to the extent that Plaintiffs make this argument on behalf of voters and voters are uncomfortable sharing their social security numbers with Plaintiffs, nothing prevents this subset of voters from registering directly with the state or another party that they trust sufficiently to provide their SSN.

Virginia's SSN requirement thus poses no "undue hindrances to political conversations and the exchange of ideas" and is not a law "governing election-related speech." *See* Compl. ¶ 97 (citing *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 192 (1999), *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995), and *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019)). It may be that "[r]estrictions on such speech are unconstitutional when they 'significantly inhibit' election-related speech and association," (*id.* (citing *Buckley,* 525 U.S. at 192)), but there is no cognizable act of the state at issue in this lawsuit that inhibits Plaintiffs' election-related speech and association.

Even if Virginia's SSN requirement inhibited Plaintiffs, they have failed to establish the state's use of SSNs is not "not warranted by the state interests . . . alleged to justify [the] restrictions." *Buckley,* 525 U.S. at 192. Asking for SSNs is not unique to the Virginia voter registration system (*see, e.g.,* McKay, 226 F.3d 752), as Plaintiffs acknowledge (Compl. ¶ 27 n. 3) and Plaintiffs presume the purpose is "to assist the state in identifying and verifying those applicants' eligibility to vote." *Id.* at ¶ 72. The Court should not substitute its judgment for that of the state as to how to fulfill this undeniably valid purpose.

The burden impacting Plaintiffs' activities is not due to Virginia's SSN requirement. First, voters' reluctance to trust Plaintiffs with their SSNs out of fear of what Plaintiffs might do with their SSNs through malfeasance or negligence—the actual operative action underlying Plaintiffs' frustration—is not *Virginia's* action. It is *Plaintiffs' actions*, approaching strangers and asking them for their SSNs to further the Plaintiffs' partisan political goals, that is discomfiting the prospective voters about the security of their SSNs. Plaintiffs of course do not have a constitutional or statutory right to possess voters' SSNs.

Second, the Plaintiffs bemoan the need to comply with *privacy laws*. Plaintiffs complain that they "must implement complex administrative procedures to ensure that individuals' SSNs are not compromised if they choose to conduct voter registration activities." Compl. ¶ 99. Collecting people's private information—including their addresses, SSNs, credit card numbers, checks, etc. —imposes a legal obligation to safeguard that information. This mundane legal compliance requirement currently applies to every candidate, party, nonprofit, and business that collects such information. It is not a constitutional violation, and Plaintiff cites no authority holding otherwise. To the extent that Plaintiffs complain of the burdens imposed upon them to comply with privacy laws, their suit should have been to challenge the impact of those laws on their political activities. The discomfort other organizations not before this Court may have in complying with consumer protection laws does not invalidate Virginia's constitutional requirements for voter registration.

Third, Plaintiffs complain about the reluctance of voters to trust them with their SSNs because of a fear of criminal hacker activity, or that Plaintiffs will mishandle their SSNs. The state of Virginia does not violate the Constitutional or federal laws because prospective voters are afraid to trust Virginia Democrats with their information, including the fear that hackers will

target Plaintiffs. Compl. ¶¶ 50, 53-54, 108, 141. The Complaint's allegation that Virginia's voter

registration form violates their "freedom of association by inhibiting and limiting the pool of

registered voters who associate with the Democratic Party in Virginia" is therefore unfounded.

Compl. ¶ 101. Nothing in the voter registration requirements prevents anyone from speaking

with or joining the Virginia Democratic Party. *See* THE DEMOCRATIC PARTY OF VIRGINIA,

https://vademocrats.org/your-party/ (last visited Jan. 11, 2022)("sign up below to join the

Virginia Democrats").

  Fourth, Plaintiffs claim that they "struggle to find canvassers who are willing to

participate in voter registration activities because doing so requires those individuals to ask

potential voters to provide highly personal and sensitive information about themselves." Compl.

99. The Complaint is ambiguous as to whether these canvassers are Plaintiffs' own members, or

if they are third-party vendors or organizations. *See id*. ¶¶ 66, 69. Assuming, *arguendo*, that

Plaintiffs speak of their own canvassers for obtaining a voter's SSN, the nature of the alleged

constitutional violation is unclear and unsupported. The Complaint alleges that "canvassers face

potential legal liability associated with collecting, maintaining, and transmitting individuals'

SSNs." *Id.* ¶ 67. No authority is cited establishing that Plaintiffs' own volunteers face liability

when registering Virginia's voters. Further, to the extent that liability stems from their own

mishandling of voters' SSNs, it is not a constitutional violation by the state of Virginia.

  Accordingly, nothing *in Virginia's voter registration law* "'limits the number of voices'

available to convey Plaintiffs' message" or "limits the size of the audience they can reach." *Id.* at

99. Gratuitously asserting this has anything to do with race (Compl. ¶¶ 63, 101) without alleging

a violation of the Voting Rights Act, is manipulative, desperate, and frivolous. The foregoing

establishes that to the extent Plaintiffs are suffering any impacts to their protected First

Amendment activities, it is the operation of privacy laws, criminals, and a lack of trust in the Plaintiffs that is the cause, not Virginia's voter registration requirements. Accordingly, the Plaintiffs' First Amendment rights have not been violated by Virginia's SSN requirement, and they have failed to state a claim upon which relief can be granted.

### B. The Complaint's Civil Rights Materiality Claim in Count II is Meritless

Count II (the "Civil Rights Materiality" claim) alleges that Virginia would violate the Civil Rights Act if it denied anyone the right to vote because they misstated their SSN or refused to provide it. The Civil Rights Act prohibits denying a person the right to vote "because of an error or omission on any record or paper relating to any . . . registration, . . . if such error or omission is not material in determining whether such individual is *qualified* under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (emphasis added).

The Complaint does not allege that Virginia has actually denied anyone the right to vote because they misstated their SSN or refused to provide it on a voter registration form. The Complaint states that "Virginia mandates that applicants include their full SSN and rejects any voter registration application that does not include the full SSN" but this statement is attributed to the Virginia State Constitution, rather than a particular incident. Compl. ¶ 115. Indeed, the only actual account of a voter in the Complaint is one involving a voter who allegedly stated they voted multiple times *without providing their SSN*. ¶ 34. There is similarly no allegation that anyone was discouraged from voting because they were afraid to share their SSN with the state. Indeed, the concern is a speculative and highly implausible concern.

Further, the Civil Rights Act prohibits requiring information "with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Id*. ¶ 112 (quoting *Martin v. Crittenden*, 347

F. Supp. 3d 1302, 1308 (N.D. Ga. 2018) (quotation marks omitted)). There is no allegation or information that Virginia's SSN requirement was *intended* to create an excuse to disqualify eligible voters.

Accordingly, the Complaint fails to state a claim in Count II upon which relief may be granted.

**C.      The Complaint's Privacy Act Allegation in Count III is Meritless**

As the Complaint concedes, "[t]here is a limited 'grandfather' provision in the [Privacy] Act, which permits a state to claim an exception from the Act's requirements if it: (1) maintained a system of records before January 1, 1975, and (2) required the disclosure of an individual's full SSN to verify an individual's identity under that system of records." Compl. ¶ 32. The Complaint does not dispute that Virginia's state constitutional requirement for voters to provide their SSNs, in Va. Const. art. II, § 2, existed before that date.

Virginia required SSNs to be recorded on voter registration forms *in 1971* — three-and-a-half years before the grandfather period ended. *See* Constitution of Virginia, 3, http://hodcap.state.va.us/publications/Constitution-01-13.pdf (establishing that "[t]he Virginia Constitution of 1971," which "was approved . . . on November 3, 1970, and became effective on July 1, 1971" included the requirement in Article II, section 2, that "Applications to register [to vote] shall require the applicant to provide . . . [a] social security number, if any[.]").

The Complaint instead offers two flimsy and faulty arguments that fail as a matter of law. First, it relies on *one* anecdote from *one* voter who claimed someone allowed them to vote without a SSN—as reflected in a Congressional Record account of a subcommittee hearing—*in 1972*. Compl. ¶ 34. Alleging that one voter told someone in 1972 that they were able to register

to vote without providing a SSN does not establish that there was no such requirement in Virginia in 1975.

Second, the Complaint contends, based solely on an unattributed quote from an undated congressional subcommittee hearing that "Virginia was still working to create a central voter registration system using the SSN as late as 1974." Compl. ¶ 34. Curiously, the complaint fails to actually allege either that a central voter system was not in place by January 1, 1975, or even that the Privacy Act of 1974 requires a "central voter registration system" for the grandfather exception to apply. Indeed, the term used in the Privacy Act for what is required for the exception is a "system of records," not a "central voter registration system." "[T]the term 'system of records' means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C.A. § 552a(a)(5). Plaintiff has not alleged Virginia did not store voter registration forms in some way or another that allowed them to retrieve a voter's form, on which the law required their SSN to be recorded.

Accordingly, the exception/grandfather clause applies, and Virginia has not violated the Privacy Act of 1974.

**D. Virginia's Voter Registration Form Does Not Impose an Unconstitutional Burden on the Right to Vote as Alleged in Count VI**

In Count VI, the Complaint perplexingly alleges that recording one's SSN on a registration form (along with a full name, date of birth, residence address, and whether the applicant is presently a United States citizen) "imposes severe burdens on the right to vote" and thus violates the First and Fourteenth Amendments. *Id.* ¶ 14. Count VI *ipse dixit* fails to explain how the state asking a person for their SSN, if they have one, is a "severe burden." It isn't costly, it isn't difficult, and every citizen over 18 years of age who earns income legally or pays taxes is

required to have one. Asking a person to provide their number, if they have one, is no more burdensome than asking for their name, address, or birthdate.

The Complaint instead contends that the state's storage of SSN's poses a target for hackers. Compl. ¶¶ 50, 53-54, 108, 141. The state is indeed subject to laws requiring it to preserve confidential information, like SSNs, and potentially liable if it does not do so. The state's mere possession of private information that *it* must safeguard, however, does not impose a burden on *citizens'* voting rights. *Greidinger*,, 988 F.2d at 1354 n.10 (4th Cir. 1993) (Virginia's voter registration scheme does not impose a substantial burden on Greidinger's fundamental right to vote if it only provides for the receipt and internal use of the SSN by the state); *McKay*, 226 F.3d at 754-757 (Tennessee requirement for a SSN to register to vote did not violate any federal constitutional or statutory rights, including the Privacy Act of 1974, Civil Rights Act of 1964, the National Voting Rights Act, the constitutional right to vote, the due process rights under the 5th and 14th Amendments, and the Privileges and Immunities Clause of the 14th Amendment).

The Complaint thus fails to allege *how* the state's SSN requirement imposes a burden on voting rights.

## II. Ballot Cure Procedures Like Those in Virginia Do Not Violate the Law Voters' Due Process Rights, as Alleged in Count IV, or Impose an Unconstitutional Burden on Virginians' Right to Vote, as Alleged in Count V

Plaintiffs argue in Counts IV and V that Virginia's permissive absentee ballot process and cure procedures violate citizen rights under the 14th Amendment to procedural due process and are an unconstitutional burden on the right to vote. Acknowledging, as it must, that there is no federal constitutional right to an absentee ballot, the Complaint fails to establish that there is a constitutional right to cure a defective absentee ballot for up to a week after an election.

Plaintiffs urge the Court to conclude there is such a right, even if the defect is wholly the fault of the voter and not the result of improper state action.

The Complaint alleges that "the process by which Virginia informs and allows voters to cure absentee ballots" is unlawful Compl. ¶ 75. Plaintiffs complain that absentee ballots may not be counted if required information the voter is responsible for providing is "missing", "wrong", or "inadequate." *Id*. at ¶¶ 77-78. This information may include things as simple as the voter's name, address, or signature. *Id*., ¶ 78. The Complaint does not challenge the legality of *any* of the absentee ballot information requirements, only the process by which voters who fail to satisfy those requirements are given a second opportunity to cure their defective ballots in order for their votes to be counted.

Absentee ballots may be dropped off as late as 7 p.m. on election day or mailed by election day—but voters must submit their ballots four days before the election in order to be *guaranteed* that the state has time to notify them of any defects and how to correct them. Absentee ballots submitted or mailed within four days of the election are not guaranteed an opportunity for the state to help them fix their errors. Compl. ¶¶ 83-86. The Complaint acknowledges that "Virginia deems curable all technical defects on an absentee envelope" (*id*. ¶ 80) and that "[v]oters have until noon on the Friday *after election day*" to fix their defective ballot in order for it to be counted. *Id*., ¶ 81 (emphasis added).

Plaintiffs' allegation that Virginia's procedure is unlawful stems from a concern over voters who wait until right before the election to mail their defective absentee ballots, thereby depriving themselves of sufficient time for the state to notify them of their error, and to help them cure their mistakes in time for their vote to be counted. Compl. ¶¶ 83-86. The Complaint alleges that somehow a person submitting an absentee ballot in an envelope without providing

the information required by law, and doing so right before the election so that the state does not have enough time to guarantee they will inform the voter how to cure their error, amounts to *the state* disenfranchising the voter and denying them due process and equal protection of the law. *Id*., ¶ 90. No supporting cases involving similar circumstances are cited for this remarkable proposition.

Plaintiffs contend that all Virginians must have "the same procedural safeguards to cure technical defects on ballot envelopes" regardless of when they choose to submit those envelopes to the state, otherwise the state is responsible for disenfranchising their votes. Compl. ¶ 129. Plaintiffs thus assert that, as a matter of rigid constitutional law, Virginia has no choice but to guarantee it will notify all voters who submit absentee ballots of their errors and assist them with correcting the errors, no matter when the absentee ballot is mailed, even if this extends well past the election. *Id*. at ¶¶ 129-130. Playing the part of a legislature, Plaintiffs assert that "it is appropriate to move the cure deadline to seven calendar days after the election" to "permit officials up to three days to issue notice to voters whose ballots are received by the Mail Deadline and still allows such voters a minimum of one day within which to respond to that notice and cure the defect." *Id*. at ¶130.

Plaintiff speculates, without any support, that there would be "little to no additional fiscal or administrative burden on local electoral boards" caused by this "simple solution." Compl. ¶¶ 131-132. Without citing any supporting data, Plaintiffs proclaim that "thousands of Virginians, including Plaintiffs' members, constituents, and supporters, will be denied due process and suffer direct and irreparable injury," that is, disenfranchisement, and "Plaintiffs' missions and efforts will be irreparably frustrated and hindered," unless the Court orders Virginia to manage its elections as Plaintiffs would prefer. *Id*. at ¶ 132.

Even if Plaintiffs' preferred policy were within the Court's power to command, the Complaint does not offer any standard to guide the Court, or information on which it would impose a superior policy decision than the one chosen by the Virginia legislature. The Complaint identifies no law or prior decision of any court providing citizens a *right* to submit a defective absentee ballot and then be given more time than Virginia allows for the voter to correct their error, much less a constitutional minimum cure period of one week after the election.

Article I, Section 4, Clause 1 of the U.S. Constitution assigns to the states the power to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," and gives Congress the power to "make or alter such Regulations[.]" The Constitution therefore assigns to the States the duty to regulate elections and, even though "voting is of the most fundamental significance under our constitutional structure," election laws "invariably impose some burden upon individual voters." *Burdick* v. *Takushi*, 504 U.S. 428, 433 (1992); *Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1186 (9th Cir. 2021). "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Id*. (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

If the strict scrutiny standard of review were applied to every state regulation, it "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick,* 504 U.S. at 433. Courts must instead apply a "flexible standard" to assess election laws, "and most laws need not meet strict scrutiny to pass constitutional muster." *Id.* at 434. The test weighs "'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests

put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* (quoting *Anderson*, 460 U.S. at 789). Courts must review laws imposing a "severe" burden on voting rights under the strict scrutiny standard. *Id.* But they must review laws imposing "[l]esser burdens" under a "less exacting review" in which a State's "important regulatory interests" will usually justify "reasonable, nondiscriminatory restrictions." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 L.Ed.2d 589 (1997) (quoting *Burdick*, 504 U.S. at 434). "[S]tates retain broad authority to structure and regulate elections." *Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018).

The Fourth Circuit has adopted this *Anderson/Burdick* framework. In *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 594, 604-05 (4th Cir. 2016), the Fourth Circuit used the *Anderson/Burdick* framework to evaluate a Virginia law that required photo identification to cast a ballot, and which allowed voters who cast flawed provisional ballots to *cure* the ballot with photo identification. These rules were challenged, among other reasons, on the basis that they placed an undue burden on a constitutionally protected right. *Id*. at 595. The Fourth Circuit held that Virginia's justifications, such as compliance with the Help America Vote Act, "prevention of voter fraud, and the preservation of voter confidence in the integrity of elections," satisfied the *Anderson*/*Burdick* analysis and, therefore, did not impose an unconstitutional burden on the right to vote. *Id*. at 606-07.

### A. Character and Magnitude of the Alleged Constitutional Violation

The first step in the *Anderson/Burdick* test is to "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that [Plaintiffs] seek[ ] to vindicate." *Anderson*, 460 U.S. at 789. Then, the Court "must identify and

evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* It then must weigh "the legitimacy and strength of each of those interests," and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* However, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).

Last month, the Ninth Circuit considered a similar challenge to Arizona's ballot envelope error cure deadline. *Hobbs*, 18 F.4th 1179. The plaintiffs alleged that Arizona's "election-day deadline for correcting a ballot with a missing signature" disenfranchised voters and, therefore, imposed a "severe" burden on voting rights. *Id*. at 1185. The district court and the Ninth Circuit soundly rejected Plaintiffs' argument and noted that "the challenged deadline imposes only minimal burdens." *Id*. at 1187. (quoting *Hobbs I*, 485 F. Supp. 3d at 1088). The Court found that Arizona's "election-day deadline for submitting a completed ballot imposes, at most, a minimal burden." *Id.*. Consequently, the Ninth Circuit did not apply strict scrutiny.

The Ninth Circuit surveyed the law of other states, finding that of the 31 states that relied on signature verification, 15 effectively disallowed any correction of a missing signature, 4 states permitted corrections through election day; and only 12 states permitted correction beyond election day. *Hobbs,* 18 F.4th at 1188. Accordingly, Virginia's *post-election day* deadline for curing absentee ballots is an even *lesser* burden on voting rights than the Arizona rule reviewed by the Ninth Circuit. The Court should therefore not apply strict scrutiny to Virginia's more generous cure process.

As in the challenge to Arizona's cure process before the Ninth Circuit, Plaintiffs here challenge the deadline for voters who, "through their own negligence only . . . fail to comply with [state] laws for submitting a completed ballot." *Hobbs,* 18 F.4that 1188 As the Ninth Circuit concluded, "[m]ost forms of voter negligence have no remedy," including "a voter who accidentally votes for a candidate other than the voter's preferred candidate or who forgets to show up at the polls on election day," neither of whom can "correct those mistakes." *Id.* Like Virginia, Arizona "offers a measure of grace" in which officials notify a voter of errors and "offer ways to correct the error . . . until election day-the same burden faced by all voters who have not yet completed a ballot—to submit a replacement ballot or a provisional ballot." *Id.*

The court was unmoved by the claim that "voters who submit—at the last minute—a [defective] ballot" having an error that officials may not discover until after Arizona's election-day cure deadline" are left with "no way to correct his or her mistake[.]" *Id.* The Ninth Circuit reasoned that if a voter's failure to comply with a voting prerequisite (which results in a vote not being counted) triggered strict scrutiny, then every voting prerequisite would be subject to strict scrutiny, but we know this is false because "not every voting regulation is subject to strict scrutiny," and "the *Anderson/Burdick* framework necessarily contemplates that election laws can impose varying burdens." *Id.* at 1188-189 (quoting *Pub. Integrity Alliance, Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016)).

The Supreme Court has held that a voter's "disenfranchisement" that is the consequence of the voter failing to meet a deadline does not establish a constitutional violation. *Rosario v. Rockefeller*, 410 U.S. 752, 757-758 (1973) ("if their plight can be characterized as disenfranchisement at all, it was not caused by [the state's statutory deadline], but by their own failure"); *see also id.* at 758 n.8 ("The point is that the statute did not prohibit the petitioners

from voting in any election, ... had they chosen to meet the deadline established by law."). Similarly, in *Burdick*, 504 U.S. at 430, the Supreme Court rejected a challenge to Hawaii's 60-day pre-election deadline for putting a candidate on the ballot, which prevented a write-in vote after that date. The Court held that "Reasonable regulation of elections . . . require[s] [voters] to act in a timely fashion if they wish to express their views in the voting booth." *Id.* at 438. Therefore, the Court held "that Hawaii's law 'imposes only a limited burden on voters' rights.'" *Id.* at 439.

On this precedent, the Ninth Circuit upheld Arizona's election-day cure deadline for voters who submitted defective ballots due to their own mistake as a reasonable, nondiscriminatory regulation "that impose[s] only a minimal burden on voting rights." *Hobbs,* 18 F.4th at 1190.

## B. State Interests

As the Ninth Circuit observed in *Hobbs*, "[e]xtending the deadline for voters to correct [an error] indisputably would impose, as a factual matter, *some* additional burden on election officials in *all* counties." *Hobbs,* 18 F.4th at 1191. "Election officials are busy in the days immediately following election day." *Id.* at 1192. Even though the Arizona Secretary of State testified that there would be no additional significant burden, the Ninth Circuit nonetheless held that "election officials in all counties would face some added administrative burden during a short period when officials are already busy tallying votes immediately following an election, in order to meet a deadline mandated by state law." *Id*.

Because the state's deadline "impose[s] only a minimal burden on the voter, [the state's] "important regulatory interest[ ]" in reducing administrative burdens on poll workers is sufficient to justify the election-day deadline for correcting missing signatures." *Hobbs,* 18 F.4th at 1192-

1193. So too, Virginia's *post-election day* deadline imposes only a minimal burden on voters, and Virginia has a sufficient interest in reducing the administrative burden on its poll workers.

The burden on the state's poll workers to notify voters their ballots are defective and help them cure their errors is necessarily more severe in the four days before the election than in the period more than four days before the election, and the feasibility of finding and curing votes before the election is also more challenging as the date of the election nears. The state also has an interest in the prompt conclusion of the election and the announcement of its results, as well as the finality of the results. Accordingly, the state has a legitimate interest in distinguishing between absentee ballots submitted earlier than four days before the election, and those submitted after that date.

In any event, where the inability to vote is the result of the voters' choice or neglect, the voter bears all responsibility for that consequence. *See Hobbs,* 18 F.4th at 1193-1194; *see also Rosario*, 410 U.S. at 758 (voters could not vote due solely to "their own failure to take timely steps"); *accord Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1324–25 (11th Cir. 2019) (distinguishing between a voter whose actions create the risk from one who is the victim of an untrained election worker).

## CONCLUSION

The long-established requirement in Virginia's constitution that its citizens provide their SSN when registering to vote does not violate their federal constitutional rights, as the Fourth Circuit held long ago. The constitutionality of this requirement is not undermined just because eliminating it would be more convenient for the Plaintiffs' partisan goals. This requirement does not limit what Plaintiffs can say to encourage voters to register, or with whom they can associate for that purpose. There is also no unconstitutional act by the state merely because voters would

rather not share their SSN with Plaintiffs out of fear for Plaintiff's negligence or third-party

hacker's crimes, or because Plaintiffs would rather not incur the cost of safeguarding their

members' SSNs.

Virginia permits absentee ballots and also guarantees it will help voters correct any errors

in their absentee ballots if they are mailed no later than four days before the election. Plaintiffs

have failed to identify a provision of the U.S. Constitution, prior judicial decision, or statute that

commands states to help voters who submitted invalid ballots due to their own errors, much less

specify in detail how long it must do so and at what cost or with what tradeoffs.  The Virginia

legislature has apparently considered and balanced the competing factors, such as wanting

eligible voters to cast valid votes, having limited election resources, and the need to efficiently

conduct its elections toward a prompt result.  It promulgated a rule guaranteeing assistance for

ballots mailed sufficiently before the election, but after that point not guaranteeing it can help

voters correct their own disqualifying errors.  Plaintiffs' preference for a more generous policy

than the one reflected in Virginia's code does not create a federal constitutional claim, and the

Complaint's attempt to concoct a constitutional cause of action conflicts with the holdings of the

Supreme Court and other circuits which have soundly concluded that a state does not violate a

citizen's rights when that citizen's vote is invalidated by their own errors.

 Plaintiffs have therefore failed to state claims upon which relief may be granted, and

their Complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.

Dated: January 12, 2022

Respectfully submitted,

By: /s/David A. Warrington
David A. Warrington (VSB No. 72293)
Dhillon Law Group Inc.
2121 Eisenhower Avenue, Suite 402
Alexandria, VA 22314
Telephone: 703.328.5369
Facsimile: 415.520.6593
dwarrington@dhillonlaw.com

Harmeet K. Dhillon*
Michael A. Columbo*
Dhillon Law Group Inc.
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: 415.433.1700
Facsimile: 415.520.6593
harmeet@dhillonlaw.com
mcolumbo@dhillonlaw.com
*Admission pro hac vice forthcoming

*Counsel for Proposed Intervenor-Defendant
Republican Party of Virginia*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this action.

Dated: January 12, 2022

By: /s/David A. Warrington
David A. Warrington (VSB No. 72293)

DEMOCRACTIC PARTY OF VIRGINIA AND )
DCCC, )
 )
        Plaintiffs, )
 )
     v. )     Civil Case No. 3:21-cv-00756-HEH
 )
ROBERT H. BRINK, in his official capacity as the )
Chairman of the Board of Elections, *et al.,* )
 )
        Defendants, )
 )
     v. )
 )
REPUBLICAN PARTY OF VIRGINIA, )
 )
        Proposed Intervenor-Defendant )
_____ )

## [PROPOSED] ORDER

This matter having come before the Court on the Republican Party of Virginia's Motion
to Dismiss in this action, and the Court being otherwise sufficiently advised,

**IT IS ORDERED:**

The Republican Party of Virginia's Motion to Dismiss is hereby **GRANTED.**

The Clerk shall send a copy of this Order to all counsel of record.

Entered this __ day of January, 2022.

_____
Henry E. Hudson, Judge
United States District Court