## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

DEMOCRATIC PARTY OF )
VIRGINIA, *et al.*, )
                )
           Plaintiffs, )
                )
v. )      Civil Action No. 3:21-cv-756–HEH
                )
ROBERT H. BRINK, in his official )
capacity as the Chairman of the )
Board of Elections, *et al.*, )
                )
           Defendants. )

### MEMORANDUM OPINION
### (Resolving Motions to Dismiss)

Administering an election in a modern democracy is complex and demanding. To complete such a formidable task and govern its elections, the Commonwealth of Virginia has implemented a scheme of statutes and regulations. While election administration is chiefly the providence of the state legislature and the executive, federal courts must ensure that Virginia's election administration comports with the U.S. Constitution and federal statutes. *See Marcellus v. Va. St. Bd. of Elections*, 849 F.3d 169, 175 (4th Cir. 2017).

It is within this purview that the Democratic Party of Virginia ("DPVA") and the Democratic Congressional Campaign Committee ("DCCC" and collectively, "Plaintiffs") challenge two of Virginia's election laws before this Court. (Compl. ¶ 1, ECF No. 1.) Those laws include the requirements that (1) an applicant must disclose their full nine-digit social security number ("SSN") to register to vote (the "full SSN requirement"); and

(2) in order to receive mandatory notice of a defect on an absentee ballot envelope, a voter must submit their ballot by the Friday before election day and such voter will have until noon on the following Friday to cure the defect (the "notice and cure process"). (*Id.*)

Currently before the Court are Defendants' two Motions to Dismiss seeking to reject this lawsuit in its entirety. ("State's Motion," ECF No. 29; "RPV's Motion," ECF No. 42.) The parties submitted extensive memoranda on the Motions and the Court heard oral argument on April 11, 2022. For the reasons that follow, the Court will grant the Motions in part and deny them in part. Plaintiffs' challenges to the full SSN requirement will survive (Counts I, II, III, and VI), while their challenges to the notice and cure process (Counts IV and V) will be dismissed.

## I.    BACKGROUND[1]

### A.    The Parties

DPVA is the officially recognized state party committee for the Democratic Party in Virginia. (Compl. ¶ 18.) Relevant here, part of DPVA's mission is to help its members register to vote and ultimately vote in person or by absentee ballot. (*Id.*) DPVA often runs registration drives for potential voters and assists its members in voting absentee by sending them reminders and monitoring the status of their ballots. (*Id.* ¶¶ 18–19.) DCCC is the national congressional campaign arm of the national Democratic

---

[1] At the motion to dismiss stage, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). The Court presents the facts in accordance with this standard.

Party. (*Id.* ¶ 22.) DCCC's mission is to elect Democrats to Congress in all states, including Virginia. (*Id.*) To that end, DCCC partners with state party organizations like DPVA to win elections. (*Id.*) DCCC "coordinates with and relies on DPVA and other similar organizations to conduct voter registration drives in Virginia." (*Id.*) Additionally, DCCC plans to run its own voter registration drives and monitor absentee ballot requests in Virginia in 2022.[2] (*Id.* ¶ 23.)

Defendants Robert H. Brink, Jamilah D. Lecruise, and John O'Bannon, all hold various positions on the Virginia State Board of Elections (the "Board"). (*Id.* ¶ 24.) Defendant Christopher E. Piper is the Commissioner of the Department of Elections (the "Commissioner").[3] (*Id.* ¶ 25.) Plaintiffs sued the State Defendants in their official capacities as they are the state employees that ultimately enforce Virginia's election laws. (*Id.* ¶¶ 24–25.)

On January 12, 2022, the Republican Party of Virginia ("RPV") filed a Motion to Intervene in this action as a defendant. (ECF No. 27.) The Court granted the Motion to

---

[2] The Complaint does not allege that DCCC has conducted similar operations in Virginia in the past. At best, it alleges that DCCC has coordinated with or assisted DPVA in running voter registration and absentee ballot drives. (*Id.* ¶¶ 22–23.) However, DCCC already operates a "headquarters" office in Virginia to coordinate their election operations and plans to open another. (*Id.* ¶ 23.)

[3] The Court will refer to Defendants Brink, Lecruise, O'Bannon, and Piper collectively as the "State Defendants." Governor Glenn Youngkin announced that Defendant Piper would be replaced with Susan Beals on March 18, 2022. Press Release, Office of the Governor, Gov. Glenn Youngkin Announces Additional Key Administration Appointments (Mar. 18, 2022), https://www.governor.virginia.gov/newsroom/news-releases/2022/march/name-930220-en. The Court, however, is unsure whether Beals has formally begun her duties and so will continue to refer to Defendant Piper as the Commissioner.

Intervene (ECF No. 40), and RPV subsequently filed their Motion to Dismiss.[4]  RPV is

the officially recognized state party for the Republican Party in Virginia.  (RPV's Mem.

Supp. Mot. Intervene at 1, ECF No. 28.)  RPV's mission is to elect Republicans to public

office in Virginia and ensure that elections are fair and accurate.  (*Id.* at 2.)  While the

State Defendants seek to defend Virginia's election laws without regard for the political

repercussions, RPV likely seeks to defend voting laws that it believes will benefit its

candidates and voters.

## B.    The Challenged Election Laws

Plaintiffs challenge Virginia's full SSN requirement and notice and cure process.

The full SSN requirement obligates an applicant to disclose their full nine-digit SSN to

register to vote.  (Compl. ¶ 1.)  This regulation is enshrined in the Virginia Constitution

adopted in 1971.  "Applications to register [to vote] shall require the applicant to provide

the following information on a standard form: full name; date of birth; residence address;

[and] social security number, if any. . . ."  Va. Const. art. II, § 2 (1971).  The full SSN

requirement is repeated in Virginia statutes regulating paper and electronic voter

registration forms.  Va. Code Ann. §§ 24.2-418, 416.7.[5]  When an applicant does not

---

[4] The Public Interest Legal Foundation (the "Foundation") also filed a Motion to Intervene (ECF No. 5), but the Court denied it on January 31, 2022 (ECF No. 37).  Nevertheless, the Court allowed the Foundation to file an *amicus curiae* brief on the State's Motion (*id.*), and the Foundation did so on February 14, 2022 (*Amicus* Br., ECF No. 44.)  With the Court's permission, Plaintiffs also filed a response to the *Amicus* Brief on March 14, 2022.  (Pls.' Resp. *Amicus* Br., ECF No. 57.)

[5] "The form of the application to register shall require the applicant to provide . . . [a] social security number, if any . . . ." *Id.* § 24.2-418.  "An electronic registration application completed pursuant to this article shall require that an applicant . . . [p]rovide a social security number . . . ." *Id.* § 24.2-416.7.

4

include their full SSN on the registration form, the registrar must deny the applicant and notify them of the denial within five days.  1 Va. Admin. Code § 20-40-40; Va. Code. Ann. §§ 24.2-418, 422.  The applicant will have a chance to submit another form or appeal the denial, but the registrar will never allow an applicant to register without disclosing their full SSN.  1 Va. Admin. Code § 20-40-40; Va. Code. Ann. §§ 24.2-418, 422.[6]

The notice and cure process that Plaintiffs challenge is more complex.  Virginia allows all voters to vote absentee, by mail or in person, without a specific reason.  *See* Va. Code Ann. §§ 24.2-700, 416.1.  Only the procedures for voting absentee by mail are relevant here.  After a voter requests an absentee ballot, the state mails them an absentee ballot and a ballot envelope 45 days before election day or, if requested closer to election day, within three business days.  *Id.* § 24.2-612.  Once a voter has filled out their absentee ballot, they must seal it inside the ballot envelope.  *Id.* § 24.2-707(A).  On the outside of the ballot envelope, the voter must fill out various information that verifies the authenticity of the absentee ballot.  *Id.*  Then, the voter can either seal the ballot envelope inside a mailing envelope and mail it the registrar or the voter can return the ballot envelope in person to the registrar's office or an approved drop off location.  *Id.* § 24.2-707(B).  A voter must return their absentee ballot in person by 7:00 p.m. on election day

---

[6] Both the Virginia Constitution and the Virginia Code state that an applicant must include their full SSN "if any."  Va. Const. art. II, § 2 (1971); Va. Code Ann. § 24.2-418.  The "if any" language does not make disclosing a full SSN optional.  A voter could register without disclosing their full SSN only in the rare circumstance where they do not have an SSN but are still eligible to vote.

or, if returned by mail and postmarked by election day, by noon on the Friday after election day. *Id.* § 24.2-709.

The registrar must reject an absentee ballot if the ballot envelope omitted material information such as: (1) the voter's first or last name; (2) the voter's full address; (3) the voter's signature; or (4) a witness' signature. 1 Va. Admin Code § 20-70-20(B). If a ballot envelope omits material information and the registrar receives it by the Friday *before* election day, the registrar must notify the voter of the error in writing or by email and give them an opportunity to correct the error (the "notice deadline"). Va. Code Ann. § 24.2-709.1(C). If a voter submits their absentee ballot *after* the Friday before election day, however, the registrar need not alert the voter of any defect on their ballot envelope.[7] *See id.* A voter may correct a mistake on their ballot envelope by the Friday after election day at noon (the "cure deadline"). *Id.*

## C.    Plaintiffs' Claims

On December 7, 2021, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief challenging these two election provisions. (Compl.) Plaintiffs argue that the full SSN requirement unconstitutionally limits their First Amendment right to associate with voters (Count I); violates a section of the Civil Rights Act of 1957, 52 U.S.C. § 10101 (Count II); violates the Privacy Act of 1974 (Count III); and unconstitutionally burdens their members' right to vote in violation of the Fourteenth Amendment (Count VI). (*Id.*) Plaintiffs additionally contend that the notice and cure

---

[7] The registrar *may* still provide notice to voters who returned defective ballot envelopes after the Friday before election day, but the law does not require the registrar to do so. *See id.*

process denies their members procedural due process as required by the Fourteenth Amendment (Count IV) and unconstitutionally burdens their members' right to vote (Count V).[8]   (*Id.*)

As a remedy, Plaintiffs request that this Court enter judgment declaring that the full SSN requirement and notice and cure process violate the U.S. Constitution and federal law. (*Id.* at 39–40.) Plaintiffs further ask that the Court enjoin the State Defendants from enforcing the challenged regulations and award reasonable attorneys' fees and costs. (*Id.*) Defendants move that the Court dismiss each of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). (State's Motion; RPV's Motion.)

## II.   STANDARD OF REVIEW

A Rule 12(b)(6) motion "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). "A complaint need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (alteration in original) (quoting *Tobey*, 706 F.3d at 387). However, a "complaint must provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

---

[8] Plaintiffs' constitutional claims are brought via 42 U.S.C. § 1983.

"Allegations have facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Tobey*, 706 F.3d at 386 (quoting *Iqbal*, 556 U.S. at 678). A court, however, "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930 F.3d at 644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)). In considering such a motion, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *Nemet Chevrolet*, 591 F.3d at 253. Legal conclusions enjoy no such deference. *Iqbal*, 556 U.S. at 678.

## III.   ANALYSIS

### A.   Standing

The U.S. Constitution limits the power of federal courts such that they can only decide "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Whether a plaintiff has standing to sue is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Article III standing is a jurisdictional question and is usually challenged under Rule 12(b)(1). *See Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). Here, Defendants did not challenge the Complaint under Rule 12(b)(1) but instead filed two 12(b)(6) motions. Nevertheless, the Court has an independent obligation to ensure that it has jurisdiction over the lawsuit. Fed. R. Civ. P. 12(h)(3). Based on the allegations in the Complaint and the parties' limited arguments, the Court finds that Plaintiffs do have Article III standing at this stage. *See Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (noting that in a

facial challenge to jurisdiction, a court must assume that the complaint's factual allegations are true).

"To satisfy the irreducible constitutional minimum of standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 899 (4th Cir. 2022) (quoting *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018)); *see Lujan*, 504 U.S. at 560–61. The traceability and redressability of Plaintiffs' alleged injury are not in doubt here. Whether Plaintiffs have suffered an injury in fact, however, is a closer question.

An injury in fact must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). An association or organization like DPVA or DCCC may bring suit based on a direct injury to itself or based on an injury to its members. *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977).

DPVA alleges that it is directly harmed by the full SSN requirement because it "threatens and inhibits DPVA's efforts to register eligible voters throughout [Virginia]." (Compl. ¶ 18.) Voters are reluctant to give their full SSN to DPVA staff members conducting voter registration drives. (*Id.*) Similarly, DPVA contacts absentee voters to assist them in requesting absentee ballots, filling them out, and returning them to the registrar. (*Id.* ¶ 19.) The notice and cure process makes it harder for DPVA to help voters cure possible defects on absentee ballot envelopes. (*Id.*) Thus, DPVA must divert

9

more resources to voter registration drives and absentee ballot efforts to comply with the full SSN requirement and notice and cure process. (*Id.* ¶ 21.) DCCC argues that it is harmed by Virginia's regulations in the same ways that DPVA is harmed. (*Id.* ¶ 23.) While DCCC has not conducted its own voting drives in Virginia, it plans to in 2022. (*Id.*) Moreover, DCCC plans to coordinate absentee ballot returns with Democratic voters in 2022 but has not done so in the past. (*Id.*)

Courts have routinely accepted similar allegations of direct injury to prove Article III standing. *E.g.*, *Crawford v. Marion Cnty. Election Bd.* (*Crawford I*), 472 F.3d 949, 951 (7th Cir. 2007) (noting that the injury need not be specifically calculated and may be small), *aff'd*, 553 U.S. 181 (2008); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) (finding that political organization had standing to challenge Indiana's voter registration laws); *Lee v. Va. State Bd. of Elections* (*Lee I*), 155 F. Supp. 3d 572, 577–79 (E.D. Va. 2015) (finding that a political party had standing to challenge a voter identification law).[9] Consequently, Plaintiffs have adequately alleged Article III standing based on a direct injury.

DPVA and DCCC may also establish standing by showing an injury in fact to their members. *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). Representational standing requires that "(1) [the

---

[9] Allegations of threatened injury must be "*certainly impending* to constitute injury in fact" and "'[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) both times). Here, the alleged injury to Plaintiffs is certainly impending. Virginia will *certainly* enforce its election laws, and Plaintiffs will *certainly* spend more resources to comply with them.

organization's] own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members." *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991). In their Complaint, Plaintiffs do not identify specific members, but they do describe generally how their members across the state are burdened by the Virginia regulations. (Compl. ¶¶ 3–14.)

The United States Supreme Court has held that a state-wide political organization has standing to challenge a state's election laws on behalf of its members so long as it has alleged that some of its individual members would have standing to challenge the laws. *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 270 (2015). The Supreme Court *did not* require the organization to point to specific individuals to prove standing.[10] *Id.*

---

[10] An earlier Supreme Court case, *Summers v. Earth Island Inst.*, required Plaintiffs to "make specific allegations establishing that at least one *identified member* had suffered or would suffer harm" to show associational standing. 555 U.S. 488, 498 (2009) (emphasis added)); *see S. Walk*, 713 F.3d at 184; *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1024–25 (N.D. Fla. 2018) (applying *Summers* in election law context). *Alabama* moderates this slightly in that a prominent political organization need not identify individual members so long as a reasonable inference can be drawn that such individuals exist. 575 U.S. at 270. The Court believes such a reasonable inference can be drawn here based on the Complaint. If Defendants seriously doubt that individual members exist such that Plaintiffs do not have associational standing, they should make a *factual* challenge to the Court's jurisdiction and demand that Plaintiffs produce some individual members. *Id.* (noting that the state never directly challenged plaintiff's standing). Regardless, even if Plaintiffs cannot produce individual members with standing, they still have standing because they sufficiently allege an imminent direct injury.

Therefore, Plaintiffs have also adequately pled that they have representational standing on behalf of their members.[11]

**B.      Statutory Claims Related to the Full SSN Requirement**

Before turning to Plaintiffs' more intricate constitutional claims, the Court addresses their two statutory ones. In Count II, Plaintiffs contend that the full SSN requirement violates the "Materiality Provision" of the Civil Rights Act of 1957 because a voter's full SSN is immaterial to whether they are qualified to vote in Virginia. (Compl. ¶¶ 110–18.) The Materiality Provision states that:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B) (recodified from 42 U.S.C. § 1971).

Under current law, a voter's full SSN likely is material to determining whether they are qualified to vote because a full SSN can confirm a person's citizenship status. Va. Const. art. II, § 1 (1971) (listing, among the qualifications to vote in Virginia, that the voter be "a citizen of the United States"); *see also Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020) (commenting that voter's name, address, and signature were similarly material to determine a voter's qualifications).

---

[11] DCCC's allegations of injury are more speculative and vague than DPVA's and so, may not be enough to constitute Article III standing. However, Article III only requires that one plaintiff have standing. *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

However, Plaintiffs have alleged that the full SSN requirement may be unlawful under the U.S. Constitution or the Privacy Act. (*See* Compl. Counts I, III, XI.) If Plaintiffs prevail on those claims, then a voter's full SSN could not be considered material. *See Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005), *aff'd* 439 F.3d 1285 (11th Cir. 2006) (holding that Georgia's full SSN requirement violated the Materiality Provision because it was unlawful under the Privacy Act). Thus, because Plaintiffs have pled facts that, if true, support their claim for relief, the Court will deny the Motions to Dismiss as they relate to Count II.

In Count III, Plaintiffs argue that the full SSN requirement violates the Privacy Act. (Compl. ¶¶ 119–24.) The Privacy Act declares that it is "unlawful for any federal, state or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his [full SSN]." Privacy Act, § 7(A)(1), Pub. L. No. 93–579, 88 Stat. 1896 (contained as amended in 5 U.S.C. § 552a note). However, a government may still require a full SSN if it, under the so-called grandfather exception, "maintained a system of records in existence and operating before January 1, 1975" that by law required the disclosure of a full SSN to verify an individual's identity. *Id.* § 7(A)(2)(B).

Defendants argue that the full SSN requirement falls under the grandfather exception because the Virginia Constitution, which contains the requirement, was adopted in 1971. (State Defs.' Mem. Supp. at 11, ECF No. 30.) In turn, Plaintiffs argue that, though the Virginia Constitution required it, the full SSN requirement was not

enforced until after 1975. (Pls.' Mem. Opp'n RPV's Mot. at 12–13, ECF No. 45 (citing nonenforcement anecdotes before 1975).)

"The burden is on [Defendants] to establish that [Virginia] qualifies for the 'grandfather' exception." *Schwier*, 412 F. Supp. 2d at 1271 (citing *N.L.R.B v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001) (holding that the burden of proving a statutory exception generally falls on the party who claims a benefit)). Thus, the grandfather exception is an affirmative defense on which Defendants must present evidence to prevail. *See id.* A motion to dismiss under Rule 12(b)(6) generally does not resolve the applicability of defenses unless "all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint.*'" *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (quoting *Richmond, Fredericksburg & Potomac R.R.Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)); *see Martin*, 980 F.2d at 952.

Here, all facts necessary to establish the defense do not appear on the face of the Complaint. Plaintiffs allege that Virginia did not uniformly enforce the SSN requirement until after 1975, and they cite specific, although limited, anecdotes to support their allegation. (Compl. ¶¶ 34, 123.) As the Court must assume those allegations are true, it cannot resolve the applicability of the grandfather exception at this stage. Beyond the grandfather exception, Plaintiffs need only allege that Virginia will currently deny a person's right to vote if they do not disclose their full SSN. Plaintiffs' Complaint

assuredly contains sufficient allegations on that point, and thus, the Court will deny the Motions to Dismiss as to Count III.[12]

## C.     Constitutional Claims Related to the Full SSN Requirement

Plaintiffs, in Count I and VI, maintain that the full SSN requirement violates the U.S. Constitution. (Compl. ¶¶ 95–109, 139–143.) Right out of the gate, RPV contends that both of Plaintiffs' claims should be discredited because the United States Court of Appeals for the Fourth Circuit has already held that the full SSN requirement does not violate the U.S. Constitution. (RPV's Mem. Supp. at 2, ECF No. 43.) The Fourth Circuit reviewed Virginia's full SSN requirement in *Greidinger v. Davis* (*Greidinger II*), 988 F.2d 1344 (4th Cir. 1993), *rev'g* 782 F. Supp. 1106 (E.D. Va. 1992). In that case, however, the key dispute was whether Virginia's *public disclosure* of a voter's full SSN was constitutionally suspect, and the court noted that "[plaintiff] does not challenge Virginia's receipt and internal use of his SSN." *Id.* at 1348. Thus, *Greidinger II* acts as a prelude to this case, but it turned on a different issue.

In the end, the Fourth Circuit ruled that public disclosure of a person's full SSN "creates an intolerable burden" on the right to vote and thereby struck down the law. *Id.* at 1355. In the process of reaching that ruling, however, the Fourth Circuit said in a

---

[12] The district court in *Greidinger v. Davis* stated that Virginia's full SSN requirement qualified under the grandfather exception of the Privacy Act. (*Greidinger I*) 782 F. Supp. 1106, 1108 (E.D. Va. 1992), *rev'd on other grounds*, 988 F.2d 1344 (4th Cir. 1993). The Court, however, cannot discern whether the parties in that case stipulated to that fact or whether the district court came to that conclusion after serious litigation. Thus, the Court does not believe *Greidinger I* has any precedential value that could limit the decision of this Court. On the other hand, the *Greidinger I* decision might serve as a precursor of Plaintiffs' ultimate failure on the merits of the Privacy Act claim.

footnote that "if the [regulatory] scheme provided for only the receipt and internal use of the SSN by Virginia, no substantial burden would exist." *Id.* at 1354 n.10. And in the next footnote, the court postulates that "[u]nquestionably, Virginia has a compelling state interest that is narrowly tailored in the receipt and internal use of a[n] SSN." *Id.* at 1354 n.11.

Those statements could be interpreted to bar Plaintiffs' constitutional claims challenging the full SSN requirement in this case. Yet, as stated above, the Fourth Circuit was clear to note that the plaintiff *did not challenge* Virginia's receipt and internal use of full SSNs. *Id.* at 1348. "[G]eneral expressions going beyond the case ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Shammas v. Lee*, 187 F. Supp. 3d 659, 663 (E.D. Va. 2016) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J.) (internal quotation marks and alterations omitted).[13] The Fourth Circuit's language about the burden and state interests relating to the receipt of the full SSN requirement is mere *dicta* and does not control the outcome of this case. *United States v. Pasquantino*, 336 F.3d 321, 329 (4th Cir. 2003). Nonetheless, the Fourth Circuit's comments in *Greidinger II* serve as persuasive authority that this Court will consider in resolving this case on the merits. *See Fouts v.*

---

[13] The United States Supreme Court has consistently reaffirmed this principle. *See Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) (noting that *dicta* need not be followed because the issue may not have been fully debated); *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 548 (2013) ("Is the Court having once written dicta calling a tomato a vegetable bound to deny that it is a fruit forever after?").

*Md. Cas. Co.*, 30 F.2d 357, 359 (4th Cir. 1929) (remarking that *dicta* is not necessarily wrong).[14]

Turning to Plaintiffs' individual constitutional claims, in Count I, Plaintiffs argue that the full SSN requirement unconstitutionally limits their First Amendment freedom of speech and freedom to associate. (Compl. ¶¶ 95–109.) The First Amendment guarantees the right of citizens to associate with each other through the formation of political groups. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997). The right to associate, however, is not absolute and must be balanced with the government's "active role in structuring elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *see Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Marcellus*, 849 F.3d at 174–75.

To appropriately balance these competing interests when analyzing state election laws, the Supreme Court has developed a framework known as the *Anderson/Burdick* test. *Marcellus*, 849 F.3d at 174–75. Courts across the country have applied *Anderson/Burdick* to regulations governing voter registration.[15] *See, e.g., Fusaro v.*

---

[14] RPV also mentions *McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000), a Sixth Circuit case that held a Tennessee requirement to provide one's SSN to register to vote did not violate constitutional rights, the Privacy Act of 1974, the Civil Rights Act, or the National Voting Rights Act. (RPV's Mem. Supp. at 5). Since *McKay* is out of circuit, it is only persuasive authority and the Court need not discuss it as in depth as it discusses *Greidinger II*.

[15] Plaintiffs' claims in Count I may be subject to a higher level of scrutiny. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995); *see Meyer v. Grant*, 486 U.S. 414, 420 (1988). Regulations directly affecting core political speech are subject to exacting scrutiny while other election regulations are subject to the *Anderson/Burdick* test. *McIntyre*, 514 U.S. at 345 (comparing test for "ordinary election restriction[s]" to test for political expression). Throughout the Complaint, Plaintiffs assume that exacting scrutiny applies to Count I. (Compl. ¶¶ 95–109.) Defendants only give this issue a fleeting look in their briefs. (*See* RPV's Mem. Supp. at 6.) It is likely that the Court should employ the *Anderson/Burdick* test. *McIntyre*, 514 U.S. at 345 (noting that the *Anderson/Burdick* test applies to "the mechanics of the electoral process"); *see*

*Howard*, 19 F.4th 357, 363–64 (4th Cir. 2021) (applying the test to regulations governing voter registration records); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626–27 (6th Cir. 2016) (applying the test to voter registration deadlines).

The rigorousness of the *Anderson/Burdick* test "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Marcellus*, 849 F.3d at 175 (quoting *Burdick*, 504 U.S. at 434). Thus, the Court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. If the burden is severe, then a form of strict scrutiny applies. *Marcellus*, 849 F.3d at 175. If the burden is minimal, reasonable, and nondiscriminatory, then a state's important regulatory interests will justify the restriction. *Id.* So, after analyzing the burden of the regulation, the Court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789.

Plaintiffs allege that the full SSN requirement burdens their freedom of association because it limits their ability to recruit and register potential voters. (Compl. ¶ 101.) It makes individual applicants more hesitant to register to vote through DPVA or DCCC because applicants are worried about the safety of their full SSN. (*Id.*) Requiring a full

---

*League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 721–22 (M.D. Tenn. 2019) (wrestling with the line between *Anderson/Burdick* and exacting scrutiny); *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1319–322 (S.D. Fla. 2008) (same); *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387–394 (5th Cir. 2013) (concluding that *Anderson/Burdick* may not even apply where no expression is involved). Nonetheless, because the parties have not briefed the issue in depth and because it does not affect the outcome of the Motions to Dismiss, the Court need not definitely decide what constitutional test should be employed. Thus, the Court will assume for now that the *Anderson/Burdick* test applies.

SSN makes applicants vulnerable to identify theft. (*Id.* ¶ 4.) After all, state databases are common targets for private hackers or even foreign cyber-attacks. (*Id.*) The sensitivity of a person's SSN is appreciated by Virginia in other areas of regulation, by the federal government, and by most other states.[16] Perhaps most convincingly, Plaintiffs note that the U.S. Census Bureau stopped requiring respondents to include their full SSN precisely because of the real or perceived security concerns. (Compl. ¶¶ 46–47.) Plaintiffs further allege that the deterring effect of the full SSN requirement most impacts black and young Virginians who are more likely to take advantage of voter registration drives and more likely to associate with the Democratic Party. (*Id.* ¶ 4.)

Without a more complete record, the Court cannot say whether the burden on Plaintiffs and applicants is substantial, minimal, or somewhere in between. *Crawford v. Marion Cnty. Election Bd.* (*Crawford II*), 553 U.S. 181, 190 (2008) (noting that weighing the burdens and interests is a "hard judgment"). Concerns about the security and privacy of an applicant's full SSN certainly can be a substantial burden. *Greidinger II*, 988 F.2d at 1348. On the other hand, the burden could be minimal considering the security precautions the state puts in place to safeguard applicant and voter data. (State Defs.' Mem. Supp. at 6–7.) Moreover, without knowing precisely how burdensome the full SSN requirement is, the Court cannot accurately compare it to Virginia's asserted

---

[16] *See* Va. Code Ann. § 24.2-407.1 (prohibiting disclosing SSNs generally); *id* § 24.2-416.5 (prohibiting disclosing SSNs found on voter registration forms); Privacy Act, § 7(a), Pub. L. No. 93–579, 88 Stat. 1896, (contained as amended in 5 U.S.C. § 552a note) (prohibiting, with exceptions, requiring individuals to disclose their SSN to government agencies to receive benefits); (Compl. ¶ 27 and ¶ 27 n.3 (noting that only three states, Virginia, Tennessee, and New Mexico require a full SSN to register to vote in any circumstance).)

interests. *Marcellus*, 849 F.3d at 175 (citing *Burdick*, 504 U.S. at 434 (maintaining that the extent of the burden determines the level of scrutiny the Court must apply)).

At this stage of the litigation all Plaintiffs must do is "state a claim to relief that is plausible on its face." *Turner*, 930 F.3d at 644 (quoting *Iqbal*, 556 U.S. at 678). Plaintiffs minimally meet this threshold, and so the Motions to Dismiss will be denied as to Count I.

Moving next to Count VI, Plaintiffs argue that the full SSN requirement unconstitutionally burdens their members' right to vote. (Compl. ¶¶ 139–143.) The analysis of Count VI is, more or less, identical to Count I. Constitutional challenges to regulations governing the right to vote are also analyzed under the *Anderson/Burdick* test. *Lee v. Va. State Bd. of Elections (Lee II)*, 843 F.3d 592, 605 (4th Cir. 2016).[17] Again, instead of applying any sort of bright line rule, *Anderson/Burdick* requires the Court to "weigh the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Crawford II*, 553 U.S. at 190 (quoting *Burdick*, 504 U.S. at 434).

Plaintiffs allege that the burden on the right to vote is the same as the burden on the right to associate discussed above: applicants fear disclosing their full SSN because of the likelihood of identity theft and third-party hacks. (Compl. ¶¶ 35–70.) While the Court cannot determine the extent of the burden put on the right to vote with this record,

---

[17] Unlike in Count I, there is no doubt that the *Anderson/Burdick* test is the correct test to determine whether a restriction on the right to vote is unconstitutional. *See id.*

Plaintiffs have at least stated a plausible claim for relief. *Turner*, 930 F.3d at 644. Thus, the Court will deny the Motions to Dismiss as to Count VI.

**D.    Notice and Cure Process**

Plaintiffs challenge the constitutionality of the notice and cure process through two different methods. In Count IV, Plaintiffs contend that the notice and cure process denies their members procedural due process as required by the Fourteenth Amendment. (Compl. ¶¶ 125–32.) First, the Court must determine which test to employ in a procedural due process challenge to an election regulation. The test in *Mathews v. Eldridge* is traditionally used in procedural due process challenges. 424 U.S. 319, 334–35 (1976).[18] The other option is the *Anderson/Burdick* test, which is typically used to analyze challenges to election regulations.

While the Fourth Circuit has not addressed this issue, all three circuits to consider the question have applied *Anderson/Burdick* instead of *Mathews*. *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1195 (9th Cir. 2021); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 233–35 (5th Cir. 2020); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020). Plaintiffs mention that one district court inside the Fourth Circuit has applied *Mathews* instead of *Anderson/Burdick*. *See Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 226 (M.D.N.C. 2020) (applying *Mathews* to an absentee voting regulation without an extended analysis of which test applies); *see also*

---

[18] The *Mathews* test requires the Court to consider (1) the private interests affected; (2) the risk of erroneous deprivation of those private interests; and (3) the government's interests and burdens in providing more process. *Id*; *see Kendall v. Balcerzak*, 650 F.3d 515, 529 (4th Cir. 2011) (applying *Mathews* after determining that right to vote was not implicated).

*League of Women Voters of S.C. v. Andino*, 497 F. Supp. 3d 59, 76–77 (D.S.C. 2020) (applying both *Mathews* and *Anderson/Burdick* without deciding which applies).

The Court finds the reasoning of the Fifth, Ninth, and Eleventh Circuits more persuasive and therefore, the Court will apply *Anderson/Burdick*. The Supreme Court has affirmatively said that a Court considering a challenge to a state election law under the First and Fourteenth Amendments "*must* resolve such a challenge" under the *Anderson/Burdick* balancing test. *Anderson*, 460 U.S. at 789 (emphasis added). In another case, it noted that *Anderson/Burdick* is suitable to cases involving "the mechanics of the electoral process." *McIntyre*, 514 U.S. at 345; *see Richardson*, 978 F.3d at 234. The Supreme Court has applied this framework to a myriad of election laws including procedural ones. *See, e.g., Crawford II*, 553 U.S. at 190 (voter ID requirement); *Rosario v. Rockefeller*, 410 U.S. 752, 756–62 (1973) (registration deadline); *see also Hobbs*, 18 F.4th at 1195 (arguing that the Supreme Court has applied *Anderson/Burdick* to procedural election regulations). Furthermore, it makes sense to have a separate constitutional test for all election laws because, unlike run-of-the-mill procedural due process issues, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974); *see Hobbs*, 18 F.4th at 1195.

*Anderson/Burdick* builds in that important consideration while the more general *Mathews* test does not. *Richardson*, 978 F.3d at 234–35; *Hobbs*, 18 F.4th at 1195.[19]

Because the Court will apply *Anderson/Burdick* to the procedural due process claim, Count IV effectively folds into Count V, and Plaintiffs' due process concerns will be considered by the Court as part of its overall analysis of the burdens and interests surrounding the notice and cure process. Consequently, the Court will now turn to Count V. In Count V, Plaintiffs argue that the notice and cure process unconstitutionally burdens their members' right to vote. (Compl. ¶¶ 133–37.) As a restriction on the right to vote, the notice and cure process is analyzed under the *Anderson/Burdick* test. *Lee II*, 843 F.3d at 605.

First, the Court considers the burdens the regulation imposes on voters. Plaintiffs primarily argue that the notice and cure process disenfranchises voters who fail to fill out the absentee ballot envelope correctly and are not given an opportunity to cure their mistake. (Compl. ¶ 135.) This assertion, however, is in tension with longstanding Supreme Court precedent. In *Rosario*, the Supreme Court rejected the idea that a *voter's failure* to follow a regulation could be said to disenfranchise that voter. 410 U.S. at 757–58. Instead, the Court need only consider the burden on voters who do follow the regulation. *Id.* at 760; *Hobbs*, 18 F.4th at 1188 ("If the burden imposed by a challenged law were measured by the consequence of noncompliance, then every voting prerequisite

---

[19] Even if *Mathews* is the correct test to apply here, it is "conceptually duplicative of the specific test" in *Anderson/Burdick* and would likely lead to the same outcome. *Raffensperger*, 976 F.3d at 1282.

would impose the same burden."). Thus, the notice and cure process in this case can never be said to disenfranchise a voter because, if a voter follows instructions, their vote will be counted. *See Rosario*, 410 U.S. at 757–58. The proper question is whether following the notice and cure process is too burdensome on voters.[20] *See Rosario*, 410 U.S. at 760.

As stated above, a voter may cure a defect on their absentee ballot envelope until noon on the Friday after election day. Va. Code Ann. § 24.2-709.1(C). However, a voter will have no knowledge of a defect unless the registrar notifies them of such a defect. Virginia law commands the registrar to notify a voter of a defect on their absentee ballot envelope if it is received by the Friday *before* election day. *Id.* If a voter submits their absentee ballot after the Friday before election day, the registrar could, but is not required to, give the voter an opportunity to correct defects on their ballot envelopes. *See id.* So, the burden on voters is that they must fill out all material information on their ballot

---

[20] Plaintiffs allege that a voter could miss the notice deadline because of postal delays outside of their control. (Compl. ¶ 11.) First, the Court notes that a voter will have up to 45 days to mail in their absentee ballot before election day. Va. Code Ann. § 24.2-612. That is enough time to avoid any postal delay in most cases. Second, any postal delays would also be out of *the state's* control. *See McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 809–10 & 810 n.8 (1969) (listing scenarios where a person may be unable to vote outside of the state's control). This Court cannot conclude that "speculating about postal delays for hypothetical absentee voters somehow renders [Virginia's] absentee ballot system constitutionally flawed." *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 146 (5th Cir. 2020). Moreover, in the special scenario that postal delays are widespread and imminent, Plaintiffs or individual voters could petition the state or file a lawsuit to receive a deadline extension. *See, e.g., Richardson v. Trump*, 496 F. Supp. 3d 165 (D.D.C. 2020).

envelope correctly, and they will only receive a chance to cure defects on their ballot envelope if they submit it by the Friday before election day.[21]

Courts have concluded that similar election regulations only create a minimal burden on the right to vote. In *Rosario*, for example, the Supreme Court addressed a New York law that required applicants to register to vote by October to participate in primaries the following year. 410 U.S. at 753–55. The Supreme Court concluded that the deadline for registration was not onerous on voters. *Id.* at 760–62. In *Hobbs*, the Ninth Circuit analyzed a notice and cure process adopted in Arizona that is almost identical to the one at issue in this case. 18 F.4th at 1183–85. Arizona allowed election officials to alert a voter of a missing signature on their absentee ballot envelope and have the voter correct it by the end of election day. *Id.* at 1184. The Ninth Circuit concluded that the law only placed "at most, a minimal burden" on voters. *Id.* at 1187.

Here, too, the notice and cure process only places a minimal burden on voters. "[A] [r]easonable regulation of elections . . . does require [voters] to act in a timely fashion if they wish to express their views in the voting booth." *Burdick*, 504 U.S. at 438 (emphasis removed). The notice and cure process only requires that, if a voter wants notice of a defect on their absentee ballot envelope, they submit their ballot a few days early and correct any defect by the Friday after election day. Va. Code Ann. § 24.2-

---

[21] The Court makes two important assumptions here. First, no voter will cure a defect on their absentee ballot envelope without the registrar alerting them of the defect because the voter has no other way of knowing about it. Second, the Court assumes that the registrar will not alert voters of defects when he or she is not required to do so by law. Surely, some registrars will decide to voluntarily notify more voters of defects on their envelopes, however, when analyzing the burden on voters, the Court should assume the worst-case scenario.

709.1(C).  All a voter must do to comply with the process is act in a timely fashion.[22]

Plaintiffs argue that the notice cutoff on the Friday before election day is too early, but

this date is reasonably related to the state's need to process absentee ballots in a timely

fashion and alleviate the post-election day strain on election officials.  *See Hobbs*, 18

F.4th at 1187

Moreover, "most forms of voter negligence have no remedy."  *Id.* at 1188.  A

voter who incorrectly fills in their in-person ballot will receive no remedy for their error.

Nor would a voter that shows up to the wrong precinct on election day without adequate

time to travel to the right precinct.  It would seem odd for the U.S. Constitution to require

additional leeway for absentee voting regulations when it does not require such leeway

for in-person voting.  *See id.*  Thus, based on the facts alleged in the Complaint, the

notice and cure process creates no more than a minimal burden on voters.[23]

Next, the Court must consider Virginia's interest in the notice and cure process.

Where the election regulation imposes a minimal burden, "'important regulatory interests

are generally sufficient to justify' the restrictions."  *Burdick*, 504 U.S. at 434, 112

(quoting *Anderson*, 460 U.S. at 788).  In cases where a lower level of scrutiny applies, the

---

[22] The burdens on the right to vote alleged here are no more than the burdens that the Fourth Circuit found to be minimal in various other cases under *Anderson/Burdick*.  *See, e.g., Lee II*, 843 F.3d at 608 (no undue burden caused by voting ID law); *Marcellus*, 849 F.3d at 178 (minimal burden on right to association); *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 717 (4th Cir. 2016) (same); *Nelson v. Warner*, 12 F.4th 376, 390 (4th Cir. 2021) (finding that ballot ordering created modest burdens at best).

[23] The burden on the right to vote may be more problematic where it "places a particular burden on an identifiable segment" of voters.  *Anderson*, 460 U.S. at 792.  However, Plaintiffs do not argue that the notice and cure process places a larger burden on any protected segment of the population.

state need only "articulate its asserted interests." *Alcorn*, 826 F.3d at 719 (internal quotations omitted) (noting that articulating an interest is a low bar in an election regulation context); *see Wood v. Meadows*, 207 F.3d 708, 717 (4th Cir. 2000) (requiring only that Virginia articulate a legitimate interest to justify its election regulation). The state is *not required* to support its legitimate interest with empirical evidence of any kind. *Alcorn*, 826 F.3d at 719; *Timmons*, 520 U.S. at 364 (1997).

Here, Virginia specifies two interests in promulgating the notice and cure process. First, it has an interest in reducing the administrative burden on election staff around election day. (State Defs.' Mem. Supp. at 16.) In the *Hobbs* case, the Ninth Circuit accepted Arizona's state interest in reducing the burden on election officials as a legitimate interest and found that the interest outweighed a minimal burden put on voters. 18 F.4th at 1190–192; *see Husted*, 834 F.3d at 634–35 (finding that reducing the burden on election officials was an important state interest when determining a voter registration deadline). This Court also agrees that reducing the administrative burden on election staff is important and legitimate.

Second, Virginia claims it has an interest in "ensuring a fair election with final results." (State Defs.' Mem. Supp. at 13, 16.) This, too, is a legitimate and important state interest. *Raffensperger*, 976 F.3d at 1282 ("conducting an efficient election" and "quickly certifying election results" are important state interests); *Libertarian Party v. D.C. Bd. of Elections & Ethics*, 768 F. Supp. 2d 174, 187–88 (D.D.C. 2011) (holding that expedient reporting of election results is a reasonable state interest).

Plaintiffs caution against dismissing the notice and cure process claims based on Virginia's state interests at the motion to dismiss stage. (Pls.' Mem. Opp'n RPV's Mot. at 15.) The Supreme Court has instructed district courts to "identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands." *Crawford II*, 553 U.S. at 190. According to Plaintiffs, it would be hard to make that "hard judgment" in this case without a complete factual record. (Pls.' Mem. Opp'n RPV's Mot. at 15–16.)

The Fourth Circuit, however, has agreed that there are some circumstances where a constitutional challenge to a state's election laws may be disposed of at the motion to dismiss stage. *Fusaro v. Cogan*, 930 F.3d 241, 259 (4th Cir. 2019). While the burden and state interests surrounding an election regulation are dependent on context, the inquiry "may nevertheless be resolved on a motion to dismiss because its resolution generally depends on legal—rather than factual—sources and considerations." *Id.* (citing *Alcorn*, 826 F.3d at 716–19).

In this case, since a lower level of scrutiny applies due to the minimal burden placed on voters, and Virginia proclaims that it has two interests that multiple courts have upheld as important in the past, dismissal of the notice and cure claims is appropriate. *See Alcorn*, 826 F.3d at 719. Thus, the Court will grant the Motions to Dismiss on Counts IV and V as they fail to state a claim for relief as a matter of law.

## IV.   CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motions to Dismiss on the full SSN requirement claims (Counts I, II, III, and VI) and grant the Motions to Dismiss on the notice and cure claims (Counts IV and V).

An appropriate Order will accompany this Memorandum Opinion.

/s/
_____
Henry E. Hudson
Senior United States District Judge

Date: **April 19, 2022**
Richmond, Virginia

29